**BRIDGESTONE/FIRESTONE, INC., Plaintiff,**

**v.**

**J.R. "Butch" LOCKHART, Jr., and Building Materials Corporation of America, d/b/a GAF Materials Corporation, Defendants.**

**No. IP 96–1838–C H/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

May 7, 1998.

Mark J.R. Merkle, Krieg DeVault Alexander & Capehart, Indianapolis, IN, for Bridgestone/Firestone.

Stephen W. Lyman, Hall Render Killian Heath & Lyman, Indianapolis, IN, for J.R. "Butch" Lockhart, Jr.

John M. Stuckey, Stuart & Branigin, Lafayette, IN, for GAF Corp.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAMILTON, District Judge.

### Introduction

This diversity action presents a broad range of factual and legal issues under Indiana law governing noncompetition covenants and trade secrets. Most of those issues involve a walk in a familiar legal landscape, but one issue requires the court to explore some new terrain. As explained below, the court finds that the former employer in this case is not entitled to injunctive relief or damages against its former employee on theories of breach of contract or misappropriation of trade secrets, or against the new employer on theories of tortious interference with contract or business relationships. The new terrain is the employee's counterclaim under an Indiana "blacklisting" statute enacted in 1889. In relevant part that statute, Ind.Code § 22–5–3–2, prohibits an employer from attempting "by words or writing, or any other means whatever, to prevent" a former employee "from obtaining employment with any other person." The statute creates a right of action for actual and exemplary damages. The court finds that the broad language of this statute applies here to the former employer's unsuccessful effort to have a court enjoin its former employee from obtaining employment with a competitor. The court awards the former employee compensatory damages in the amount of his attorneys' fees in defending the case, but not exemplary damages, because the former employer had a reasonable basis in fact and law for its claims. Pursuant to Fed.R.Civ.P. 52, the court now states its findings of fact and conclusions of law. Whether a point is treated as a finding of fact or a conclusion of law

should be governed by the substance rather than the court's labels.[1]

### Findings of Fact

1. *The Parties and Claims:* Plaintiff Bridgestone/Firestone, Inc. brought this action to prevent defendant J.R. "Butch" Lockhart, Jr. from going to work for defendant Building Materials Corporation of America, which does business as "GAF Materials Corporation" ("GAF"). Bridgestone/Firestone, Inc. is an Ohio corporation with its principal office in Tennessee. Firestone operates the Firestone Building Products Company as an unincorporated division. The principal offices of Firestone Building Products Company are in Indiana. Firestone Building Products manufactures and sells a variety of roofing products usually described as "commercial" roofing. These products are suitable for use on flat and "low-slope" roofs. Some of the major products include EPDM rubber roofs, PVC roofing materials, modified bitumen roofing membranes, "built-up" roofing systems, and Isocyanurate insulation board. Firestone Building Products does not manufacture or sell any roofing shingles or similar so-called "residential" roofing materials suitable only for steep-slope roofs.

When this action was filed, defendant Lockhart was a resident and citizen of Indiana. Lockhart worked in sales for Firestone Building Products from its founding in approximately 1979 until 1991. Firestone Building Products terminated Lockhart in 1991. Another division of Firestone hired Lockhart in 1992 to work in its tire business based in Nashville, Tennessee. Lockhart then moved back to Firestone Building Products in Indiana in 1993 and became the vice president of sales.

Defendant GAF is a Delaware corporation with its principal place of business in New Jersey. GAF sells and manufactures a wide variety of roofing products. About 75 percent of its roofing business is in shingles and

---

1. On January 12, 1997, this court denied plaintiff's motion for a temporary restraining order. The court decided the motion for temporary restraining order less than 48 hours after an emergency hearing of a few hours. This matter was

tried to the court on June 23–25, 1997. After the trial, the court has considered the factual and legal issues anew on the basis of a much more extensive record.

other so-called "residential" products suitable for steep-slope roofs. Nevertheless, a substantial volume of its roofing business is in so-called "commercial" products suitable for flat or low-slope roofs.

As vice president of sales for Firestone Building Products, Lockhart was responsible for sales of all company products. In that capacity, Lockhart had direct contact with many customers and developed goodwill with those customers for the benefit of Firestone Building Products. Customer relationships and loyalties are important in both "commercial" and "residential" roofing because the products and markets are relatively mature and competitive, and do not involve a high degree of product differentiation. Lockhart's employment with Firestone Building Products ended effective December 21, 1997, under circumstances set forth below.

In early January 1997, Lockhart began working for GAF as vice president of national accounts and specialty sales with the "residential" roofing business. Around May 1997, Lockhart's title changed to vice president of "Program Platinum," which is a GAF program designed to improve relationships with, and increase sales to, roofing contractors who buy and then install its "residential" roofing products.

At Firestone Building Products, Lockhart had access to a variety of types of information that Firestone Building Products treats as confidential, including financial data as to product costs, sales by customer, by product, and by salesman, as well as sales and marketing strategies. Plaintiff has not identified any technical product information or manufacturing techniques that would qualify as trade secrets. However, through confidentiality agreements and restricted access to the compilations of financial and customer information and business plans, Firestone Building Products takes reasonable steps to maintain the confidentiality of these types of information. See Ind.Code § 24–2–3–2 (defining "trade secret").

Plaintiff seeks a permanent injunction prohibiting Lockhart from working for GAF for 18 months and prohibiting disclosure of trade secrets. Plaintiff also seeks damages from both defendants on theories of breach of contract, misappropriation of trade secrets, tortious interference with contract, and tortious interference with business relationships. Defendant Lockhart asserts counterclaims for a variety of alleged breaches of contract and failure to pay wages, for tortious interference with his business relationship/contract with GAF, and for violation of an Indiana blacklisting statute. GAF asserts a counterclaim seeking a declaratory judgment that would essentially approve of its defenses to plaintiff's claims.

2. *Lockhart Rehired by Firestone Building Products:* In 1993, Kevin Caughlin, who was then vice president of sales for Firestone Building Products, left the company and went to work for a competitor. President Paul Mineart contacted Lockhart, who was then working in Firestone's tire business in Nashville, about joining Firestone Building Products as vice president of sales. Lockhart eventually accepted the offer and moved back to Indiana to begin work in early October 1993. Mineart asked for and Lockhart gave an informal (and non-binding) commitment to stay for three years.

3. *The Noncompetition Agreement:* After Caughlin's departure, Mineart also directed the company's inside counsel, Thomas Clayton, to prepare a new noncompetition agreement for use with key personnel. In November 1993 Lockhart signed an agreement to protect Firestone Building Products' confidential and trade secret information. Ex. 100. The agreement refers to the employer as "Firestone Building Products Company and its affiliated companies (Firestone)." Ex. 100 at 1.[2] The agreement also contained an 18–month noncompetition covenant set forth below. Mineart insisted that Lockhart and other key employees sign this form of agreement about a month or two after Lockhart had moved his family from Nashville to Indiana to take the position with

---

**2.** The copy of the agreement submitted to the court shows that Lockhart signed the agreement both for himself and on behalf of Firestone, see Ex. 100 at 4, but there is no serious question about whether Lockhart and Firestone entered into the agreement.

Firestone Building Products.[3] Firestone Building Products would have fired Lockhart if he had not signed the agreement. Firestone Building Products paid Lockhart $665 (or $500 after withholding for taxes) for signing the agreement.[4]

The contract includes promises by Lockhart to protect the confidentiality of his employer's "trade secrets and other confidential information." The contract also provided:

> You further agree that within an eighteen (18) month period following termination of employment with Firestone that You will not: (1) directly or indirectly own, manage, operate, control, or in any way be connected with any business entity which manufactures and/or sells EPDM and/or PVC and/or Modified Bitumen Roofing Membranes and/or Built–Up Roofing and/or Isocyanurate Insulation Board; (2) directly or indirectly be employed by or consult with any business entity which manufacturers [sic] and/or sells EPDM and/or PVC and/or Modified Bitumen Roofing Membranes and/or Built–Up Roofing and/or Isocyanurate Insulation Board; or (3) directly or indirectly, for yourself or for any other person, firm or corporation, divert, take away, solicit or attempt to divert, take away or solicit, any Firestone customer which you called upon, came in contact with, or became aware of, as a result of your employment with Firestone.

> Furthermore You agree that within an eighteen (18) month period following termination of employment with Firestone that You will not directly or indirectly own, manage, operate, control, be employed by or consult with any business entity which is in the same or similar business to that which is being conducted by Firestone at the time of your termination or in a capacity identical or similar to that for which

You were compensated while in the employ of Firestone.

\* \* \* \* \* \*

> It is not Firestone's intention to in any way interfere with former employees' employment opportunities, except in those situations as described herein where there is a conflict with Firestone's legitimate business interests. You understand that in the event you have any question regarding the applicability of this Section, it is your responsibility to notify Firestone's Human Resources Department, and Firestone will notify you of its position.

Ex. 100 at 3. The noncompetition covenant applies to the continental United States. *Id.* at 1. The agreement provides that it is governed by Indiana law. *Id.* at 4.

4. *The Proposed Sale of Firestone Building Products:* In late 1994, Bridgestone/Firestone, Inc. tried to sell Firestone Building Products. One potential buyer was defendant GAF. The two companies entered into a confidentiality agreement to allow GAF to examine certain information about Firestone Building Products in order to carry on meaningful negotiations. See Ex. 217; see also Ex. 218 (information concerning scheduled visit by GAF "evaluation team" to Firestone Building Products on February 14, 1995, in Indiana). The confidentiality agreement included an agreement by GAF not to solicit key Firestone employees, including Lockhart, for two years following November 16, 1994. Ex. 217 at 2. Lockhart was aware of the efforts to sell Firestone Building Products, and as vice president of sales, his position was such that he reasonably expected that if the company were sold, he could very easily lose his job. He began exploring other possibilities.

5. *The "Retention Agreement" Between Lockhart and Firestone Building Products:* In late 1995, Lockhart was contacted by

---

3. Mineart contends that he and Lockhart discussed the prospect of a noncompetition agreement before Lockhart took the job with Firestone Building Products. The written offer letter for the job does not refer to a noncompetition agreement, however, and Keith Boland testified that the agreement was first discussed in a staff meeting after Lockhart returned to Firestone Building Products.

4. Not all personnel who were asked to sign the agreements did so. Less senior personnel who did not sign were allowed to stay on the job but were excluded from certain meetings involving confidential information. As vice president of sales, however, Lockhart could not have continued on the job without signing the agreement.

North American Roofing Company, a commercial roofing contractor for whom Lockhart had worked in the past. Lockhart was offered an opportunity to join the business at a senior level and to buy part of the company. Lockhart discussed the new opportunity with Mineart. Since Lockhart had been with Firestone Building Products, business had grown "dramatically," as Mineart testified. He encouraged Lockhart to stay and reminded Lockhart of his commitment to give Firestone "three good years." Their discussions resulted in execution of a confidential agreement on January 25, 1996, to keep Lockhart at Firestone Building Products. Firestone agreed to pay Lockhart on January 15, 1997, "a one time lump sum special payment of $25,000 gross in consideration of successfully meeting three basic qualifiers." Ex. 145. The three "qualifiers" were: (1) Lockhart's continued employment with Firestone Building Products through December 31, 1996; (2) Lockhart's assistance during 1996 in selecting and grooming a successor; and (3) total and complete confidentiality of the agreement. The agreement noted that it also assumed Lockhart would follow his plan to pursue "outside (non-competing) business interests in 1997." Firestone Building Products agreed to make the one-time payment even if Lockhart stayed at Firestone past December 31, 1996. The agreement also stated "your advance notice to Paul Mineart is expected (60 day minimum) either way you decide. Clearly this will be most critical as plans are implemented to position your successor." Ex. 145. Bridgestone/Firestone's corporate human resources managers in Nashville, including Chuck Ramsey, were aware of this retention agreement, but Keith Boland, the human resources manager for the Firestone Building Products division, was not aware of it until December 6, 1996.

6. *Lockhart Negotiations with GAF:* Lockhart has known Sunil Kumar, now the president of GAF, for a number of years. Kumar had worked for Bridgestone/Firestone for many years and had been the first president of Firestone Building Products from its founding until 1990. Lockhart had worked with Kumar at Firestone Building Products from the founding of the business until Kumar left, and they had worked together more recently in the tire business.[5] Before Kumar left Bridgestone/Firestone in February 1995 to join GAF, he had been an executive vice president of Bridgestone/Firestone, was president of the tire division of the company, and a member of the Bridgestone/Firestone board of directors. Kumar's move to GAF was the subject of extensive negotiations and written agreements. For example, Kumar remained a member of the Bridgestone/Firestone board for several months after joining GAF. In addition, Kumar agreed that for two years after he left the Bridgestone/Firestone board, he would not solicit or attempt to solicit Bridgestone/Firestone employees to terminate their employment with the company. Ex. 213 at 6.[6]

In about late August 1996, Lockhart contacted Kumar and asked to meet with him in conjunction with a trip to New York to see the United States Open tennis tournament. They met at an airport. Lockhart told Kumar that he was not happy at Firestone Building Products and was considering leaving. Lockhart asked if there would be any possibilities for him at GAF. Kumar later talked with Jack Sinnott, GAF's vice president for human resources, about Lockhart and asked him to call Lockhart. Sinnott called Lockhart in September and sent him a package of materials about GAF, as well as information about housing costs in New Jersey near GAF headquarters. GAF and Lockhart then arranged for Lockhart and his wife to make a weekend visit to GAF on

---

5. After Kumar left as president of Firestone Building Products, his successor essentially removed Lockhart from the company in 1991. Lockhart received a year's salary and benefits, then returned to work for Bridgestone/Firestone in the tire business in 1992.

6. Kumar left Bridgestone/Firestone pursuant to an agreement dated Friday, February 10, 1995, with an effective date of Wednesday, February 15, 1995. Ex. 213. At the same time, GAF was exploring the possible purchase of Firestone Building Products, and Kumar was listed as a member of the GAF "evaluation team" coming to visit Firestone Building Products for possible purchase on or about Tuesday, February 14, 1995. See Ex. 218.

October 18–20, 1996. That visit included interviews with senior GAF officials. During that visit, Lockhart showed GAF officials a copy of his noncompetition agreement with Firestone. The visit produced favorable impressions on both sides, but no offer was made. In the course of discussions, GAF learned that Lockhart was also exploring opportunities with a company called ABC Supply in Beloit, Wisconsin. ABC Supply is a roofing distributor that is GAF's biggest customer and also a customer of Firestone's. GAF told Lockhart that it would not compete with its biggest customer for his services, but they continued their discussions.

On approximately October 30, 1996, Kumar contacted Chuck Ramsey, who was then the vice president of human resources for Bridgestone/Firestone.[7] At the time, Ramsey was in a law office in Chicago in the midst of intense collective bargaining during a national strike of the company. Kumar and Ramsey agree they had the discussion but have different recollections about some important details. Kumar was calling at the suggestion of Jack Sinnott, the human resources manager for GAF. Kumar testified that he asked Ramsey for permission to discuss employment opportunities at GAF with Butch Lockhart. Ramsey testified that Kumar asked for permission to discuss opportunities at GAF with an unidentified employee in an unidentified division of Bridgestone/Firestone. Kumar and Ramsey agree that they discussed whether Bridgestone/Firestone would object based on Kumar's consulting agreement, which had several more months to run. Both Kumar and Ramsey agree that Ramsey gave Kumar permission to pursue the contacts notwithstanding Kumar's own consulting agreement. Kumar testified that he specifically raised the issue of Lockhart's noncompetition agreement with Ramsey, but Ramsey disagrees. For present purposes, however, the salient point is that Kumar and Ramsey agree that Ramsey did not give Kumar any explicit assurance that GAF could hire Lockhart notwithstanding Lockhart's noncompetition agreement.

In the course of negotiations with GAF, Lockhart provided a copy of the form of noncompetition agreement with Firestone Building Products. GAF's lawyers analyzed the agreement, and GAF and Lockhart tried to agree on a position for Lockhart that would not violate his agreement. They settled on a position as vice president of national accounts and specialty sales with the residential division of GAF for 18 months. That position was newly created for Lockhart. It was designed specifically to try to avoid violating Lockhart's agreement with Firestone.

In approximately late November 1996, Lockhart called Chuck Ramsey, told him that he had opportunities with other companies, and asked Ramsey for advice about opportunities in Bridgestone/Firestone, Inc. According to Ramsey, they did not discuss Lockhart's noncompetition agreement with Firestone Building Products. Lockhart referred to Ramsey's earlier conversation with Kumar, and asked Ramsey whether he had told Paul Mineart about his earlier telephone call with Kumar. Ramsey said he had not. Ramsey had the authority to grant both Kumar and Lockhart permission to go forward. Lockhart says he told Ramsey about GAF and Ramsey told him to do what was best for his family. Even according to Lockhart, however, there was no specific discussion of the noncompetition agreement, and no specific authorization from Ramsey to go forward with GAF despite that agreement.

Sometime in the autumn of 1996, as the end of the one-year retention agreement with Lockhart was approaching, Mineart asked Lockhart about his plans. According to Lockhart, he told Mineart that as far as he knew he was staying, unless he got a better offer. Lockhart testified that Mineart responded, "I understand." Mineart testified that Lockhart assured him without qualifica-

---

7. To show how small this particular world is, Kumar first met Ramsey in 1983 or 1984 when Kumar was president of Firestone Building Products and Ramsey was interviewing for a position as controller of the business. Kumar chose to hire Paul Mineart, instead, who went on to become the president of the business. Ramsey is currently president of the agricultural tire division of Bridgestone/Firestone.

tion that he was staying.[8]

During the autumn of 1996, Lockhart was also exploring opportunities with Ken Hendricks, the president and chief executive officer of ABC Supply Company in Beloit, Wisconsin. Lockhart and his family drove to Wisconsin on the afternoon of Thursday, November 14, 1996, for a Friday visit with Hendricks to explore those possibilities further. Hendricks testified that he was favorably impressed, but neither he nor Lockhart pursued the possibility further after that visit.

After the visit to ABC Supply, Lockhart told GAF that he was not pursuing that possibility further, and Kumar confirmed that with Hendricks.[9] Lockhart made another trip to New Jersey the day before Thanksgiving to visit with senior GAF management. On November 27, 1996, GAF sent Lockhart a formal offer letter. Lockhart made one more trip to GAF in New Jersey on Friday, November 30, 1996.

7. *Lockhart's Resignation from Firestone Building Products:* During the first week of December 1996, Lockhart told several colleagues at Firestone Building Products that he intended to or might be going to work for GAF. He shared this information with vice president of marketing John Larimer, controller Wayne Hunter, and Nancy Larson. Lockhart told Hunter of his plans on Thursday, December 5, 1996, and showed Hunter a letter of resignation he had drafted and intended to give to Mineart the next day. He told Hunter he was going to GAF, and Hunter told him he thought that "smelled" and that he did not think Lockhart could do that under the noncompetition agreement. Lockhart told him that he would be involved only in the shingles ("residential" or low-slope) side of GAF's business. That same day, December 5, 1996, Wayne Hunter told Thomas Clayton, the inside counsel, that Lockhart had said he intended to leave and go to GAF.

Hunter told Clayton that Lockhart intended to tell Paul Mineart on Friday, December 6th. Hunter and Clayton decided to wait to see what Lockhart did on the 6th.

During the week of December 2—6, 1996, Lockhart was still negotiating terms with Jack Sinnott of GAF. GAF also wanted Lockhart to sign a noncompetition agreement, and Lockhart wanted to include an exception that would allow him to return to Firestone. Sinnott refused to agree to that exception. In addition, several financial terms apparently remained up in the air.

Lockhart's draft letter to Mineart stated that he was resigning from Firestone Building Products to take a position with GAF. The letter was dated December 6, 1996, and said that his resignation would be effective "on or after January 1, 1997." Ex. 104. On Friday, December 6, 1996, Lockhart talked with Firestone Building Products human resources chief Keith Boland and told him that he was "going to be submitting his resignation." Lockhart showed him the letter to Mineart. Boland asked Lockhart about the noncompetition agreement. Lockhart told him that it would not be a problem because GAF's counsel had determined that the "residential" roofing position with GAF would not violate his agreement with Firestone. Boland was not aware of the confidential retention agreement that called for 60 days notice from Lockhart, but Lockhart described the agreement for Boland. Boland reminded Lockhart of a Firestone policy that puts an upper limit of two weeks on the notice that Firestone will accept. Boland explained that if Lockhart resigned on December 6th, his termination date would be two weeks later, so that Lockhart would not be eligible for the substantial year-end management bonus. Boland advised Lockhart to delay any tender of resignation until December 18, 1996, so that the two week period would end after December 31, 1996. Lockhart decided to take that approach, but still planned to re-

8. The difference is not legally material. Although the litigation has a definite personal edge to it, as is often true in such cases, Lockhart did not have any obligation to keep Mineart apprised of his ongoing search for better job opportunities. This would be true in any case, but it is especially true in this case, where the owners of

the business Lockhart worked for had been trying to sell the business.

9. Kumar and Hendricks differ in their recollection of these communications, but the differences are not material and do not affect the court's evaluation of their credibility.

sign and to join GAF. Boland also advised Lockhart to call Chuck Ramsey again, the vice president of human resources for Bridgestone/Firestone, Inc. Boland did not report this conversation to Mineart on December 6th. Lockhart left for home that night without telling Mineart that he intended to resign.

After Lockhart left the office on the 6th, Clayton and Hunter knew that Lockhart had left without telling Mineart that he intended to resign. Clayton and Hunter then talked with Mineart about 6 p.m. and told him about Lockhart's intentions. They decided to "sleep on it" and agreed that Mineart, Clayton, and Boland should meet early Saturday morning to discuss the situation. That Friday night, Clayton called Boland at home and told him to come to the office early Saturday morning to accept Lockhart's resignation. Mineart, Clayton, and Boland also decided that they needed to tell Lockhart that they wanted to prevent him from going to work for GAF because they believed his employment would be a violation of his noncompetition agreement with Firestone.

Mineart called Lockhart at home early on Saturday morning, December 7, 1996, and told him to come to the office right away. The security code had been changed on the building, so Lockhart could not open the locked door by himself. He met with Mineart, Boland, and Clayton. Although Lockhart had not yet tendered his resignation and at that time intended to delay resigning, Mineart told Lockhart that he was treating his discussions with Boland and others as a "verbal [sic] resignation," that he was accepting Lockhart's resignation effective two weeks later, and that Lockhart could not return to Firestone's premises during those two weeks. Lockhart was given a letter from Mineart stating that his resignation was accepted and stating Firestone's belief that taking the position with GAF would violate Lockhart's noncompetition agreement with Firestone. Ex. 105. Lockhart tried to explain his situation to Mineart, but Mineart refused to listen to any explanations. Clayton and Boland then escorted Lockhart to his office and supervised while he packed up personal belongings. Boland then accompa-

nied Lockhart to his home to retrieve some office equipment supplied by Firestone. Lockhart has not returned to Firestone's office since then.

8. *Lockhart's Employment with GAF:* Lockhart and Sinnott continued to negotiate the details of GAF's offer, and a few days before Christmas, Lockhart formally accepted the GAF offer to become vice president of national accounts and specialty sales. He joined GAF in January 1997 shortly before plaintiff sought and the court denied a temporary restraining order. In his new role, Lockhart dealt with large national and regional retailers that buy a large volume of shingles from GAF. In that role, Lockhart had no involvement in GAF's "commercial" (low-slope) products. However, he did attend some meetings of GAF's senior management where both "residential" and "commercial" businesses were discussed. The evidence before the court indicates that Lockhart often left those meetings when commercial products were specifically discussed and has not participated in or contributed to any discussion of GAF's "commercial" roofing business or products. In approximately May 1997, Lockhart's duties were changed and he became vice president and general manager of Project Platinum, a special program developed for roofing contractors who buy and install GAF shingles.

9. *The Ambiguous and Misleading Dichotomy Between "Commercial" Roofing and "Residential" Roofing:* There is an important ambiguity in the language of the roofing business that is a major source of potential confusion in this case. Plaintiff has repeatedly tried to exploit this ambiguity to create confusion about the relevant factual and legal issues in this case. The parties and witnesses have frequently referred to "commercial" roofing and "residential" roofing. As these terms are used most often (but not always), they do not refer at all to the use of the building under the roof. The term "commercial" roofing is used most often to refer to "low-slope roofing," meaning roofs that are flat or have a pitch of less than two vertical inches for every twelve horizontal inches. The term "residential" roofing most often refers to steep-slope roofing, meaning

roofs with a pitch of more than two vertical inches for every twelve horizontal inches. A steep-slope roof does not need to be water-tight if it is made of materials that can effectively shed water using the slope. A low-slope roof must be water tight and must remain water-tight against water pressure (*i.e.*, standing water) on top of it. Low-slope roofs therefore generally include some kind of water-tight membrane, or layers of asphalt or "modified bitumen" roofing.

The terms "residential roofing" and "commercial roofing" are ambiguous and potentially confusing because low-slope roofing products ("commercial roofing") are used on many residences, while steep-slope roofing products ("residential roofing") are used on many commercial or public buildings. See Ex. 171 at 2, Ex. 225. The real dispute here concerns the extent of competition between low-slope and steep-slope roofing products. The roofing industry clearly thinks and talks about these as two separate markets. The court has no evidence on the cross-elasticities of demand that economists would ordinarily use for market definition for antitrust purposes, for example. The only disinterested witness who testified in this case, and one of the most credible witnesses—Ken Hendricks of ABC Supply—compared the two lines of products to the difference between cars and heavy semi trucks. He pointed out that even where both types of roofing are used on the same building, different unions actually install the different types. He also pointed out that roofing manufacturers who produce and sell both types do so in different divisions so that he, as a customer, deals with different people.

In a few instances there may be direct competition between low-slope and steep-slope roofing products. When a new building is being designed, an architect may consider both types of roofing materials in deciding the slope of the roof, although there is no evidence showing that an architect at that stage ordinarily compares the products of particular manufacturers and chooses the roof slope based on a specific product preference. Also, in some situations, a leaking flat roof can be repaired by retrofitting a steep-slope roof over it. On the whole, however, the evidence shows that there is no substantial competition between low-slope and steep-slope roofing products. Plaintiff's argument that "a roof is a roof is a roof" is untenable on this record.

Some roofing distributors, who are customers or potential customers of GAF and Firestone Building Products, sell both "commercial" (low-slope) and "residential" (steep-slope) roofing. One building may have both low-slope roofing and steep-slope roofing on it, and therefore may have different types of roofing materials. Firestone Building Products contends that where both low-slope and steep-slope roofing products are used on the same building, there are advantages for the builder or buyer in dealing with only one roofing company to provide all the roofing materials together. GAF's Kumar disagreed, although GAF has in the past advertised itself as the "single source" for commercial and residential roofing products. Ex. 180 at 2. Ken Hendricks is the most credible witness on this point, and he sees no significant advantages to buying the two types of roofing from one supplier. Among the companies like GAF that manufacture and sell both lines of products, the companies use separate sales organizations for the two lines and use separate programs of financial incentives, rebates, and the like to encourage purchase of their products.

Firestone Building Products has repeatedly tried to show in this case that "commercial" products are sometimes used on residences and that "residential" products are sometimes used on commercial and public buildings. These efforts include, for example, large stacks of Firestone Building Products warranty documents showing installation of "commercial" products on residences. Ex. 234. These efforts have only emphasized the ambiguity in the industry's use of the terms, but they are utterly beside the point when it comes to showing the existence or extent of any significant competition between "commercial" (meaning low-slope) and "residential" (meaning steep-slope) roofing products.

10. *Confidential Information at Firestone Building Products:* Firestone Building Products treats information about customers'

usage rates for various products and their rankings as confidential. Such customer-specific information can be quite valuable in planning marketing efforts, even if a competitor could theoretically assemble the information by calling all of the customers. In addition, information about Firestone's pricing, its production costs, and its profit and operating margins is valuable and is treated as confidential. Lockhart had access to all that information as vice president of sales. He was also involved in strategic planning. The information about pricing, costs, and sales would age, but would not be immediately obsolete. Firestone executives testified that information from November or December 1996 would still be valuable to competitors in June 1997. However, the information would need to be very accurate to retain its value. In this mature market, the value of the information would lie in the difference between the estimates of an informed and experienced outsider and the precise information available to insiders. Neither Lockhart nor current Firestone executives could remember any of the precise information at trial without having financial reports in front of them. There is no evidence that Lockhart took any documents with him when he left Firestone Building Products.

11. *Lockhart's Abortive Switch to Consultant for GAF:* At the time of trial, Lockhart had changed his title to vice president and general manager of "Program Platinum," which is a marketing program for "residential" (steep-slope) roofers. As a result of family concerns, Lockhart delayed moving his family to New Jersey after he began working for GAF. He and GAF signed a consulting agreement dated April 30, 1997, but they either did not follow through on that agreement or quickly rescinded it. As far as the court can tell, Lockhart has been an employee of GAF since January 1997.

12. *Consequences of Lockhart's Move from Firestone Building Products to GAF:* Firestone Building Products has presented no evidence that it has lost any customers or sales to GAF even following Lockhart's departure, let alone as a result of his departure. Firestone Building Products also has presented no evidence that Lockhart has provided any of its confidential information to GAF. In an effort to prove some damages, plaintiff calculated that it had spent $3.1 million on industry meetings and events in which Lockhart played key roles in 1994, 1995, and 1996. See Ex. 220. Plaintiff's controller Wayne Hunter described these expenditures as "investments" *in Lockhart!* These expenditures were the total costs of Firestone participation in national regional meetings and other events for promoting goodwill with customers. The expenditures calculated by Hunter included travel expenses for all Firestone Building Products personnel, as well as dinners, liquor, and golf expenses for hundreds of customers. This claim of damages is absurd. This evidence concerns years during which, according to Mineart, plaintiff's sales rose "dramatically," and after which there has been no known loss of business. Yet this evidence treats all of these expenditures as having benefitted Lockhart *personally.* Plaintiff has not proved any damages resulting from Lockhart's or GAF's actions.[10]

---

**10.** The court is troubled, to put it mildly, by plaintiff's handling of this evidence. Hunter testified that he performed these calculations in January or February 1997 and gave them to Thomas Clayton. GAF asked in its Interrogatory No. 13:

Does Firestone claim that is has sustained monetary damages as the result of any action or inaction on the part of GAF or of Mr. Lockhart which Firestone contends was wrongful or improper? If so, please state: a) each and every item of monetary damages; b) its amount; c) the manner in which you have calculated the amount; and d) the name and address of each person with knowledge of these facts.

Plaintiff's response was signed under oath by Thomas Clayton on April 29, 1997:

Yes. Discovery is ongoing in this case and Firestone is still gathering information responsive to this request. The testimony of Paul Mineart previously elicited establishes that Firestone has experienced a drop in market share the first quarter of 1997 which it believes may be as a result of the action and/or inaction by GAF and/or Lockhart. The exact dollar amount represented by a one point drop in market share has yet to be calculated. Firestone's Witness List previously filed in this case includes the names and addresses of persons with knowledge of the facts responsive to this interrogatory, including Wayne Hunter, Paul Mineart and John Larimer.

13. *Bridgestone/Firestone Policies:* Bridgestone/Firestone has adopted "Guidelines for Business Conduct" set forth in Exhibit 124. These policies address conduct ranging from bribery of foreign governments to sexual harassment, insider trading, and personal use of company property. In this case, plaintiff has focused on portions of the conflict of interest provisions which treats as conflicts of interest:

> Using for personal gain or benefit any inside information, proprietary data, equipment, materials, employees, or other assets of the Company. All information regarding the Company, including information about its operations, earnings, products, and future plans, which is not available to the investing public as a whole, is "inside information."

Ex. 124 at 4. Plaintiff complains that Lockhart violated this policy by using company facsimile machines and telephones in contacting GAF and ABC Supply when he was considering and then negotiating for possible employment with them. Lockhart's cellular phone bills show a few calls to Jack Sinnott at GAF. Ex. 164. His telephone credit card bills show a few calls to GAF. Ex. 165.

Keith Boland conceded that some personal telephone calls by employees are acceptable so long as they are not excessive. He conceded that none of Firestone Building Products' 1,000 or so employees have been disciplined for misuse of company property, for excessive personal telephone calls, or for personal use of facsimile machines. Mineart testified that he had never used a company telephone for any personal reasons and was never aware of others having done so. Lockhart testified credibly that Mineart had used telephones at the office to obtain parts for a sports car and for other purposes. Lockhart's personal use of telephones was minor and not materially different from other employees' use of them.

As the senior salesman for Firestone Building Products, Lockhart worked hard for the company and was very successful. His work was not limited to a 40–hour week. Lockhart used accrued vacation time for his trips to interview with GAF and with ABC Supply. Plaintiff's claim that Lockhart improperly failed to take vacation time when he left early one afternoon for his trip to ABC Supply is trivial and requires no further consideration.

14. *Lockhart Counterclaims for Salary and Bonuses and for "Blacklisting":* Under Firestone's "B Plan" bonuses based on the company's profitability, an executive must be an active employee at the end of the calendar year in order to be eligible for the bonus. This requirement is not in the written plan but is nevertheless a consistent company practice. An executive who leaves in mid-year is not eligible, although partial benefits are paid in the case of a mid-year retirement. Also, Firestone has termination benefits for management employees like Lockhart. The precise details of these benefits are not clear, but the benefits would include at least six months pay. These benefits are not available to an employee who leaves voluntarily.

Lockhart has hired an attorney to represent him in this dispute with Bridgestone/Firestone. The attorney had billed him somewhere between $50,000 and $60,000 at the time of trial. GAF also agreed to indemnify Lockhart for his legal expenses in this case and thus far has paid his legal bills.

### Conclusions of Law

#### I. Preliminary Issues

This court has jurisdiction over the parties and over the subject matter. The parties are of diverse citizenship. The amount in controversy exceeds both the $50,000 threshold in effect when this action was filed and the

---

Ex. 233. Plaintiff made no effort at trial to prove the referenced drop in market share. Conspicuously absent from the April interrogatory response is any mention of Hunter's calculations of damages given to Clayton in January or February, and presented at trial in June. These calculations were not even turned over before Hunter's deposition on May 20, 1997, although GAF's counsel was able to draw out the absurdity of these damage calculations on the spot. See Hunter Dep. at 67–76 (filed with court but not part of the evidentiary record for trial). Because the evidence is so wholly inadequate on its face to prove any damages, however, the court will not pursue the additional issues raised by the failure even to mention this evidence in the interrogatory response.

$75,000 threshold which took effect a few weeks later. Before turning to the central issues of plaintiff's claims for breach of contract and misappropriation of trade secrets, two issues raised by defendants should be addressed.

■ First, GAF and Lockhart argue that Lockhart was involuntarily fired by Firestone Building Products. Defendants argue that after Lockhart talked with Keith Boland on December 6, 1996, he changed his mind about the timing of the resignation. They also argue that Mineart's letter of December 7, 1996, "accepting" a resignation that had not been tendered should be ignored and that the entire transaction should be treated as an involuntary termination. This issue is important for several reasons. By its terms, the noncompetition agreement does not apply if Firestone Building Products fired Lockhart without good cause. In addition, Lockhart's claims for year-end bonuses and the $25,000 sum in the Retention Agreement depend at least in part on this issue.

The facts of this case provide a textbook example of how not to resign and leave a company gracefully. Lockhart's chief mistake was choosing to confide his plans to other senior managers for Firestone Building Products before he was prepared to tell Paul Mineart, the president. News that the vice president of sales was planning to leave and to go to work for GAF quickly and predictably reached Mineart. It was eminently reasonable for Mineart to treat the situation as a voluntary resignation, constructive or otherwise. Moreover, Lockhart never changed his mind about whether he was leaving and going to GAF. He changed his mind only about the timing after Boland warned him that the timing was likely to prevent him from receiving very substantial year-end bonuses (approximately 44 percent of his annual base salary). After Lockhart made known his intentions to leave and to join GAF, Firestone Building Products was not required to allow Lockhart to control the precise timing of his departure. Instead, it adhered to standard policy of allowing two weeks notice and left Lockhart on its payroll for two weeks after December 7, 1996. Lockhart's departure from Firestone Build-ing Products was not an involuntary termination.

■ Second, defendants argue that the telephone calls from Kumar and Lockhart to Chuck Ramsey should result in a finding of waiver or estoppel so that plaintiff may not enforce the noncompetition agreement with Lockhart. The argument is not persuasive. Kumar got a green light from Ramsey with respect to Kumar's own consulting agreement, which prohibited solicitation of Bridgestone/Firestone employees but was about to expire in a few months. Kumar's and Lockhart's contacts with Ramsey were too subtle and ambiguous, however, to produce the desired legal effect with respect to Lockhart's agreement. All witnesses agree that Ramsey never gave any explicit permission for GAF to hire Lockhart despite Lockhart's noncompetition agreement. It is highly unlikely that he would have done so under these circumstances and without consulting either the general counsel at corporate headquarters in Nashville or the president of Firestone Building Products. If GAF or Lockhart wanted a green light that they could rely upon in court, they were too subtle about it in dealing with Ramsey and did not give him all the relevant information. Although Ramsey could have taken the trouble to discover more relevant information and to ask more questions, he did not do so. Without having presented the issue to Ramsey more explicitly than they did, GAF and Lockhart could not reasonably rely upon Ramsey's failure to protest. Plaintiff did not waive, and is not estopped from asserting, any contractual rights it might have.

## II. Plaintiff's Trade Secret Claim

■ Indiana has adopted the uniform trade secret legislation drafted by the Commission on Uniform State Laws. Ind.Code § 24–2–3–1 et seq. The statute allows courts to issue injunctions to prevent threatened misappropriation of trade secrets. Ind.Code § 24–2–3–3. There is no evidence that Lockhart took with him from Firestone Building Products any documents or other records containing Firestone Building Products trade secrets. Nevertheless, Lockhart's knowledge of plaintiff's business includes some in-

formation that qualified as protected trade secrets, at least at the time he left. Lockhart participated in developing Firestone's 1997 budget and business plan. Knowledge of financial information indicating the company's strengths and weaknesses, its production and marketing costs, its sales information and profit margins broken down by product, by customer, by salesperson, and by region could all be helpful to another manufacturer of competing products, especially in markets for highly competitive, relatively fungible products like commercial roofing products. Indiana courts recognize that such information can be protected as trade secrets. See *Ackerman v. Kimball Int'l, Inc.*, 634 N.E.2d 778, 783–84 (Ind.App.1994), *aff'd*, 652 N.E.2d 507 (Ind.1995); *Kozuch v. CRA-MAR Video Center, Inc.*, 478 N.E.2d 110, 113 (Ind.App.1985); see generally *Amoco Production Co. v. Laird*, 622 N.E.2d 912, 919–20 (Ind.1993) (fact that competitors could gather confidential information lawfully by investing substantial time and money did not foreclose protection of information as trade secrets). Lockhart need not possess this information in a tangible form or recall precise numbers for this type of information to qualify as trade secrets under Indiana law. The court is satisfied that Firestone Building Products took reasonable steps to ensure the confidentiality of the financial information and customer information at issue here. See Ind. Code § 24–2–3–2 (definition of "trade secret").

Nevertheless, such information about customers, cost, and pricing is among the most fragile and ephemeral types of trade secrets. For example, the difference between an outsider's informed estimate of production costs and an insider's precise information is likely to be very small in a mature industry like this one where executives often move from one competitor to another. Similarly, current pricing information may have value, but customers are always free to compare competing prices and invite one competitor to beat another's offer. The value and reliability of any small difference between the outsider's informed estimate and the insider's precise information are likely to erode quickly.

The trade secret statute does not prohibit a former employee who has knowledge of trade secrets from going to work for a competitor. The statute prohibits only "misappropriation" of trade secrets, meaning disclosure and/or use of the information to the disadvantage of the owner of the trade secret. Ind.Code §§ 24–2–3–2 (defining "misappropriation"), –3 (authorizing injunctions against actual or threatened misappropriation), –4 (authorizing damages for misappropriation). Plaintiff has argued that Lockhart will "inevitably" disclose confidential information through his work at GAF. The argument is not persuasive. Plaintiff relies heavily on *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507 (Ind.1995), *affirming* 634 N.E.2d 778 (Ind.App.1994), and on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir.1995), to argue that misappropriation is inevitable if Lockhart works for GAF in any capacity. Plaintiff's argument based on *Ackerman* and *PepsiCo* is not persuasive.

In *Ackerman*, an executive who had been negotiating with a competitor for possible employment learned that his current employer planned to terminate him. The day before he learned of his termination, he had requested and received copies of the employer's customer and supplier lists, and he presumably took those lists with him when he joined the competitor. When the former employer sought an injunction to stop him from working for the competitor, the trial court "specifically found that in light of Ackerman's pre-departure harvesting of Kimball's proprietary information, there was a threat of misappropriation." 652 N.E.2d at 510–11. *Ackerman* shows that where there is such clear evidence that the departing employee does not intend to honor the continuing obligation to preserve the confidentiality of trade secrets, a court may enjoin employment with a competitor for a limited period of time, at least where no less restrictive remedy appears likely to be effective. However, the broad injunctive relief granted in *Ackerman* remains the exception rather than the rule.

*PepsiCo v. Redmond* presented a closer case, and one more similar to this one. The case was decided under the Illinois version of the uniform trade secret statute. A high-

level manager for certain PepsiCo products had access to sensitive information about PepsiCo's costs, pricing, and marketing strategies. He resigned and joined a competitor in a position that made him directly responsible for managing products that competed directly with the PepsiCo products he had managed. 54 F.3d at 1264–66. The district court found that the employee would inevitably use PepsiCo's trade secrets in his new position. That finding was based on both the nature of the new position and the employee's lies and lack of good faith. See *id.* at 1270–71. The Seventh Circuit affirmed a preliminary injunction prohibiting the new employment based on the theory of "inevitable" disclosure. *Id.* at 1271; cf. *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1205 (7th Cir.1987) (competitor's hiring of senior executive did not warrant injunction against employment based on fear of disclosure of confidential information).

*Ackerman* and *PepsiCo v. Redmond* are both instructive here, but neither case warrants a finding of inevitable disclosure on this record. Lockhart took no documents or other confidential information with him when he left Firestone Building Products. He obviously has a thorough knowledge of the business, but the court finds credible Lockhart's testimony and the testimony of others who stayed at Firestone Building Products that they cannot remember with precision the financial information that is so sensitive. A general familiarity with plaintiff's financial data has limited and diminishing potential value as compared to a knowledgeable outsider's estimates about the business. Unlike the facts in *Ackerman*, the record here does not indicate that Lockhart has violated or is likely to violate his obligation to keep plaintiff's information secret. He made no efforts to take confidential information with him. When GAF and Lockhart worked out his employment arrangements, they were very aware of Lockhart's obligations to Firestone Building Products and worked hard to develop an arrangement that would not violate the terms of the noncompetition agreement. They have kept Lockhart away from any direct competition with Firestone Building Products. They have also made known among senior GAF management the nature

of Lockhart's obligations to Firestone Building Products. There is no evidence that Lockhart has made any disclosure of confidential information to anyone in any part of the GAF organization, nor is there any reason that he would need to do so in order to fulfill his new responsibilities at GAF. There is no evidence that Firestone Building Products has suffered any loss of sales or customers or that anyone at GAF has used any of plaintiff's confidential business information. This lack of evidence of harm is not conclusive, but it certainly tends to corroborate the testimony of Lockhart and others at GAF that no such disclosures have occurred. Because misappropriation does not appear to be inevitable, or even seriously threatened, this case is different from *PepsiCo v. Redmond.* Plaintiff has not shown that Lockhart's employment with GAF threatens misappropriation of trade secrets so as to warrant a permanent injunction.

### III. *Plaintiff's Breach of Contract Claim*

 Plaintiff's central claim in this lawsuit is that Lockhart's employment by GAF in any capacity violates the terms of the noncompetition agreement he signed. The general contours of the applicable Indiana common law are well established. Covenants not to compete are in restraint of trade and are not favored. Courts construe such agreements strictly against the employer and enforce such agreements only if the agreements are reasonable. *Harvest Insurance Agency v. Inter–Ocean Ins. Co.*, 492 N.E.2d 686, 688 (Ind.1986); *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 127 N.E.2d 235, 237 (1955); *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1085 (7th Cir.1993) (covenant not to compete must be ancillary to primary purpose of otherwise lawful contract). As a general rule, noncompetition agreements between employee and employer are subject to stricter scrutiny than covenants that are ancillary to the sale of a business. See, *e.g., Harvest Insurance Agency*, 492 N.E.2d at 688; *Brunner v. Hand Industries, Inc.*, 603 N.E.2d 157, 159 (Ind.App.1992). In deciding whether an agreement is reasonable, the court must consider the legitimate interests of the employer, the extent of the restrictions

on the employee, and the public interest. See, *e.g., Harvest Insurance Agency,* 492 N.E.2d at 688–89; *Slisz v. Munzenreider Corp.,* 411 N.E.2d 700, 704 (Ind.App.1980). This determination must be made on a case-by-case basis, considering the legitimate interests of the employer and the scope of the prohibition in terms of time, geography, and types of activity. *Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556, 561 (Ind.1983).

 One aspect of Indiana law is especially important here. If a noncompetition agreement is unreasonably broad in its prohibitions, Indiana courts do not rewrite the agreement or enforce it to the extent that such enforcement would be reasonable. Instead, overly broad restrictions are not enforceable to any extent. Nevertheless, where an agreement contains distinct and readily severable provisions, and where some are valid while others are not, Indiana courts apply the so-called "blue pencil doctrine" and may strike out the invalid provisions · and enforce the valid provisions. See *Licocci v. Cardinal Associates,* 445 N.E.2d at 561. This blue pencil doctrine is fairly mechanical in application, so as to prevent courts from simply writing a new contract for the parties:

If the covenant as written is not reasonable, the courts may not create a reasonable restriction under the guise of interpretation, because to do so would subject the parties to an agreement they have not made. [*Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d at 561.] However, if the covenant is clearly separated into parts and some parts ˙are reasonable and others are not, the contract may be held divisible and the reasonable restrictions may be enforced. *Id.* In such cases, unreasonable provisions are stricken and reasonable provisions are enforced under the blue pencil process. [*Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 462 (Ind.App.1991).] Blue penciling must be restricted to applying terms which already clearly exist in the contract and the court's redaction of a contract may not result in the addition of terms that were not originally part of the contract. *Id.* Simply put, if practicable, unreasonable˙ restraints are rendered reasonable by scratching out any offensive

clauses to give effect to the parties' intentions. [*Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 215 (Ind.App.1982).]

*Smart Corp. v. Grider,* 650 N.E.2d 80, 83–84 (Ind.App.1995); cf. *Ridgefield Park Transport v. Uhl,* 803 F.Supp. 1467, 1470 (S.D.Ind. 1992) ("blue pencil" redaction not possible where contract included "a seamless web of conditions" that rendered it unreasonable); *Frontier Corp. v. Telco Communications Group, Inc.,* 965 F.Supp. 1200, 1209 (S.D.Ind. 1997) (applying Michigan law,· court may essentially rewrite an overly broad noncompetition agreement so as to enforce it to the extent that enforcement is reasonable). Thus, under Indiana law, as distinct from Michigan law for example, if an employer is trying to enforce an overly broad noncompetition agreement, the court may not try˙ to fix the problem simply by writing an injunction the court thinks would be reasonable.

 Lockhart's noncompetition agreement is drafted with four distinct prohibitions that must be considered separately pursuant to the Indiana blue pencil doctrine. The court considers them in reverse order. The last one states:

Furthermore You agree that within an eighteen (18) month period following termination of employment with Firestone that You will not directly or indirectly own, manage,˙ operate, control, be employed by or consult with any business entity which is in the same or similar business to that which is being conducted by Firestone at the time of your termination or in a capacity identical or similar to that for which You were compensated while in the employ of Firestone.

Ex. 100 at 3. This prohibition is unreasonably broad and unenforceable. The most important flaw is that the prohibition applies to "Firestone," which is defined in the agreement as "Firestone Building Products Company and its affiliated companies." Ex. 100 at 1. Firestone Building Products Company is an unincorporated division of Bridgestone/Firestone, Inc., which includes numerous businesses in a wide range of industries. As drafted, this provision in Lockhart's noncompetition agreement thus attempts to prohibit him from working for "any business

entity which is in the same or similar business to that which is being conducted" by *any portion* of Bridgestone/Firestone, Inc. at the time of his termination. That bar extends far beyond any legitimate interest the employer might have in this case. The court could not render this provision reasonable by striking any parts of it. The only way to cure the problem would be to add new language that would narrow its scope, and Indiana courts do not engage in such efforts to rewrite overbroad covenants.[11]

The third prohibition in Lockhart's noncompetition agreement states that Lockhart will not:

> (3) directly or indirectly, for yourself or for any other person, firm or corporation, divert, take away, solicit or attempt to divert, take away or solicit, any Firestone customer which you called upon, came in contact with, or became aware of, as a result of your employment with Firestone.

Ex. 100 at 3. This prohibition is also unreasonably broad and unenforceable. As drafted, it prohibits solicitation of Firestone Building Products customers for any business whatsoever, whether that business competes with Firestone Building Products or not. As drafted, this prohibition would therefore prohibit Lockhart from trying to sell plumbing supplies, long-distance telephone service, or delivery trucks to businesses that he called upon, came in contact with, or became aware of through his employment as vice president of sales for Firestone Building Products. This prohibition also cannot be saved by the blue pencil doctrine. The only way to fix it would be to add language to limit it to efforts to divert or take away business from Firestone Building Products. Such additions are not permitted under Indiana law.

11. Also, as the contract is drafted, it is unclear whether the phrase "or in a capacity identical or similar to that for which You were compensated while in the employ of Firestone" modifies the broad term "any business entity" (in which case it would prohibit Lockhart from doing sales work in virtually any industry) or instead modifies some narrower subset of businesses.

12. The introductory portion of the contract provides that the non-competition covenant applies

Even if this provision could be "blue penciled" by striking the prohibition on soliciting or attempting to solicit plaintiff's customers, and leaving in place the prohibitions on diverting or taking customers away from plaintiff, the evidence shows that Lockhart has not been in contact with Firestone Building Products customers in any effort to take away their business from Firestone Building Products. His efforts have been limited to "residential" (steep-slope) roofing products that do not compete in any meaningful way with Firestone Building Products. Plaintiff is not entitled to relief based on this prohibition in Lockhart's noncompetition agreement.

The principal area of dispute here concerns the first two prohibitions in the agreement. They state that Lockhart will not:

> (1) directly or indirectly own, manage, operate, control, or in any way be connected with any business entity which manufactures and/or sells EPDM and/or PVC and/or Modified Bitumen Roofing Membranes and/or Built–Up Roofing and/or Isocyanurate Insulation Board; (2) directly or indirectly be employed by or consult with any business entity which manufacturers [sic] and/or sells EPDM and/or PVC and/or Modified Bitumen Roofing Membranes and/or Built–Up Roofing and/or Isocyanurate Insulation Board....

Ex. 100 at 3.[12] GAF does manufacture and sell EPDM and modified bitumen roofing, and Lockhart is employed by GAF. The central issue here is whether these two prohibitions are unreasonably overbroad because they attempt to prohibit Lockhart from working for GAF in any capacity. Plaintiff contends that it has a legitimate business interest in preventing Lockhart from working for GAF in any capacity. Defendants argue that so long as Lockhart confines his

to the "continental United States." Ex. 100 at 1. This geographic scope is not unreasonable as applied to Lockhart because of his national responsibilities for Firestone Building Products. In fact, in the low-slope "commercial" roofing market, Firestone Building Products and GAF compete internationally. Also, there is no contention here that the 18 month term of all the noncompetition provisions is unreasonably long.

work for GAF to its "residential" products that do not compete with Firestone Building Products, there is no legitimate reason to prohibit him from doing that work.

The court agrees with defendants that these two prohibitions are unreasonably broad because they apply to work *in any capacity* for a business entity that sells any of the specified products that compete with Firestone Building Products. Plaintiff's legitimate interests do not extend that far. As drafted by the employer, these provisions would bar Lockhart from driving a truck or working on the factory line or working as a personnel manager or a file clerk for GAF. Similarly, there is a problem in the term "business entity." The best way to illustrate the problem is to look at Firestone Building Products itself, which is an unincorporated division of Bridgestone/Firestone, Inc. If Bridgestone/Firestone hired an employee who was subject to an identical prohibition in another company's noncompetition agreement, the contract language would prohibit the hiring of that employee to work in Bridgestone/Firestone's automobile tire business, agricultural tire business, or other lines of business. See *Austin Powder Co. v. Wallwork*, 761 F.Supp. 612, 617 (S.D.Ind.1990) (noncompetition covenant was overly broad to the extent it applied to "all conflicting organizations with conflicting products, with one exception [not present here] for diversified businesses"); *Schlumberger Well Services v. Blaker*, 623 F.Supp. 1310, 1316 (S.D.Ind.1985) (prohibition on working for competitor in any capacity was overly broad and unenforceable outside of geographic area where employee actually worked for plaintiff), *aff'd*, 859 F.2d 512 (7th Cir.1988). The prohibition as drafted therefore extends far beyond the employer's legitimate interests and is thus not enforceable.

█ Despite plaintiff's persistent efforts to confuse the issue, there is no meaningful competition between the steep-slope products that Lockhart is promoting for GAF and the low-slope products that he sold for Firestone Building Products. The work that Lockhart is now doing for GAF will not cause any competitive harm to Firestone Building Products. The only conceivable legitimate interest that plaintiff might have in preventing Lockhart from working for GAF is to remove the temptation to use plaintiff's confidential information. That interest essentially amounts to a reprise of plaintiff's "inevitable misappropriation" theory under the trade secret statute, and it is no more persuasive in terms of the contract theory. The types of confidential information to which Lockhart had access at Firestone Building Products are not secret manufacturing techniques or formulas. They are, as discussed above, the weakest kind of trade secrets—cost, pricing, and marketing information, the value and reliability of which erode quickly. In addition, Lockhart has no responsibilities at GAF connected in any way with low-slope products, and there is no evidence showing any threat of disclosure or use. If the mere possession of cost, pricing, and marketing information were, without more, enough to justify a contractual prohibition on working for a competitor in any capacity, that would represent a substantial broadening of the permissible scope of noncompetition covenants under Indiana law.

Plaintiff relies most heavily on evidence showing that Lockhart attends some management meetings at GAF in which some reports are given by other executives concerning GAF's low-slope roofing products. There is no evidence, however, that Lockhart contributes anything at all to these discussions, let alone that he has ever brought up any information concerning plaintiff or its products. To the contrary, the evidence shows that Lockhart and GAF have been very conscious of the limitations on Lockhart and have taken reasonable and successful steps to ensure that he does not participate in the low-slope side of the business, at least during the 18–month period following his departure from Firestone Building Products.

In sum, then, all of the noncompetition provisions in plaintiff's contract with Lockhart are unreasonably broad and unenforceable.

### IV. *Plaintiff's Claims for Tortious Interference*

These claims depend on plaintiff's claims that Lockhart is threatening to misappropri-

ate trade secrets or is breaching his contract with Firestone Building Products. Because the court has found in favor of Lockhart on those claims, plaintiff's claims for tortious interference with contract and with business relationships must also be rejected.

## V. Lockhart's Common Law Counterclaims

Lockhart seeks damages from Firestone Building Products on several different counterclaims, two under the common law, and one under the blacklisting statute. Under the common law, he first seeks payment of bonuses for the end of 1996 under the "B Plan" bonus system and the private Retention Agreement. The evidence on the B Plan shows that Lockhart was not entitled to the very substantial bonus unless he was still employed at the end of the calendar year. He was not. The Retention Agreement also provided several clear conditions, including continued employment with Firestone Building Products through December 31, 1996. Lockhart did not comply with that condition.

Lockhart argues that he should nevertheless be awarded those sums because Mineart decided to fire him before he was ready to leave, and did so in order to avoid paying those sums. Assuming for purposes of argument that such a motive on Mineart's part might entitle Lockhart to those payments, the court believes Mineart was entitled to treat Lockhart's actions as a resignation with two weeks notice, as discussed above. Two weeks was the general practice within the company. The Retention Agreement stated that 60 days notice to Mineart would be expected, but notwithstanding the court's comments in denying plaintiff's motion for a temporary restraining order, the more complete record shows that Lockhart has little basis for complaining on that basis. Lockhart did little to select and groom a successor during 1996, which was also required under the Retention Agreement.

■■■■ Second, Lockhart contends that Firestone Building Products has tortiously interfered with his business relationship with GAF. Under Indiana law, a claim for tortious interference with a business relationship requires proof of five elements:

1. the existence of a business relationship;

2. the defendant's knowledge of the existence of the relationship;

3. intentional interference with the business relationship through unlawful acts;

4. the absence of justification for the interference; and

5. damages resulting from the defendant's actions.

*Wright v. Associated Insurance Cos.*, 29 F.3d 1244, 1252 (7th Cir.1994); *Economation, Inc. v. Automated Conveyor Systems*, 694 F.Supp. 553, 556 (S.D.Ind.1988); *Furno v. Citizens Ins. Co. of America*, 590 N.E.2d 1137, 1140 (Ind.App.1992). Apart from the provisions of the Indiana blacklisting statute discussed below, it is not unlawful for an employer to seek court enforcement of its interpretation of a noncompetition agreement, or to seek an injunction against actions it reasonably believes may threaten misappropriation of trade secrets. Accordingly, Lockhart's tortious interference claim adds nothing to his claim under the blacklisting statute.

## VI. Lockhart's Counterclaim for "Blacklisting"

■■■■ Lockhart seeks compensatory and punitive damages under one of Indiana's blacklisting statutes, Ind.Code § 22–5–3–2. That statute provides in full:

> If any railway company or any other company or partnership or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

This statute was enacted in 1889. The focus, of course, was the blacklisting practices of railroads in the late 19th century most familiar today from reading the history of the labor movement in the United States. The

statutory language, however, is considerably broader than railroads' efforts to "blacklist" union organizers and members. The statute is not limited to railroads; it applies also to "any other company or partnership or corporation in this state." Lockhart relies on the language that makes it unlawful for such an employer to "*attempt* by words or writing, or *any other means whatever*, to prevent ... any employee who may. have voluntarily left said company's service, from obtaining employment with any other person, or company...." Lockhart contends that this language is readily applicable to plaintiff's effort to obtain an injunction prohibiting his employment by GAF. This statute appears not to have been the subject of any reported court decision since its enactment.[13]

In opposing Lockhart's blacklisting counterclaim, plaintiff relies primarily on Judge Lee's opinion in *Hull v. Central Transport, Inc.*, 628 F.Supp. 784 (N.D.Ind.1986). In that case a plaintiff sought relief under a related blacklisting statute, Ind.Code § 22–5–3–1, the immediately preceding section in

---

**13.** After this opinion was issued, the case of *Wabash Railroad Co. v. Young*, 162 Ind. 102, 69 N.E. 1003 (1904) came to the attention of the court. In that case the Supreme Court of Indiana held that the statute now codified as Ind.Code § 22–5–3–2 did not apply to a former employee who had left employment voluntarily. The court explained that the title of the act was "An act for the protection of discharged employees and to prevent blacklisting," and that Article 4, section 19 of the Indiana Constitution requires that an "act of the legislature can embrace but one subject and matters properly connected therewith, which subject must be expressed in the title." 162 Ind. at 104, 69 N.E. 1003. The court then said:

> The subject of the act of March 9, 1889, *supra*, is the protection of discharged employees. The prevention of blacklisting of discharged employees was a matter properly connected with this subject. But the subject of the protection of discharged employees does not include the protection of employees who have not been discharged, or who voluntarily quit the service of their employer. Nor is the protection of employees who voluntarily quit their employment matter properly connected with the subject of the protection of discharged employees.

*Id.* Under Article 4, § 19, the court therefore held the act void as applied to the plaintiff in *Young*, who alleged that his former employer blacklisted him after he had quit his job voluntarily. *Id.* at 104–05, 69 N.E. 1003.

That rigorous application of the "one subject" requirement stands in sharp contrast to the Indiana court's approach to similar issues in many cases both before and after *Young*. As the facts in this case illustrate, the line between quitting and being fired is sometimes very fine, certainly so fine that it seems difficult to say there would be no reasonable basis for linking them in one act. As a general rule, the Indiana court has upheld legislation against "one subject" challenges if there appears to be "any reasonable basis" for linking the subjects. See generally *Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 531–32, 418 N.E.2d 207, 214 (Ind.1981) (collecting cases and upholding combination of statutes on local court administration and product liability; "if there is any reasonable basis for grouping together in one act various matters of the same nature, and the public cannot be deceived reasonably thereby, the act is valid," quoting *Stith Petroleum Co. v. Dept. of Audit and Control of Indiana*, 211 Ind. 400, 409, 5 N.E.2d 517 (1937)); *Dortch v. Lugar*, 255 Ind. 545, 551–552, 266 N.E.2d 25, 30–31 (1971) (upholding act reorganizing municipal government in Indianapolis and Marion County, "we are permitted to indulge in a very liberal interpretation rather than a critical and strict construction calculated to defeat the act"); *Orbison v. Welsh*, 242 Ind. 385, 391–95, 179 N.E.2d 727, 731–32 (1962) (Art. 4, § 19 is satisfied when title gives such notice as to apprise legislators and the public of the general subject matter; title of act creating port commission did not need to refer specifically to issuance of revenue bonds, construction of airports, railroads, roads, or sewers, or relocation of roads, railroads, or utility facilities because all were properly connected to matters in the title); *State v. Steinwedel*, 203 Ind. 457, 467–73, 180 N.E. 865 (1932) (single act combining mandatory school attendance and limits on employment of minors dealt with subjects sufficiently related to satisfy § 19); *Bright v. McCullough*, 27 Ind. 223, 226 (1866) (act addressing election of highway supervisors and assessment of road tax dealt with single subject of "highways" and did not violate § 19); see also *Bayh v. Indiana State Bldg. & Const. Trades Council*, 674 N.E.2d 176, 179 (Ind. 1996) ("What one person might see as evil logrolling, another might view as simple give and take. The single subject provisions of the Constitution and the enrolled act rule are designed to promote fair practice in legislating without much judicial intervention.").

Because *Wabash Railroad v. Young* did not come to this court's attention until after the court found that defendant Lockhart is entitled to recover under the blacklisting statute, this court has not tried to weigh that holding and the lack of any apparent legislative response to the case in nearly a century against the weight of more recent authorities under Article 4, section 19 of the Indiana Constitution, which take a more generous approach to the legislature's power to link rationally related subjects in one act.

**688**

the Indiana Code. That provision states that when a person who discharges an employee "prevents the discharged employee from obtaining employment with any other person," the act is an infraction and subject to a civil action. By its plain language, § 22–5–3–1 requires proof that the employee was actually prevented from obtaining other employment, and the court so held in *Hull,* 628 F.Supp. at 793. That analysis is obviously correct, but it does not apply to Lockhart's claim under § 22–5–3–2, which includes in its prohibitions an "attempt by words or writing or any other means whatever" to prevent a former employee from obtaining other employment. The blacklisting statute is worded broadly, and deliberately so, especially with its use of the phrase "or any other means whatever." It requires no creative interpretation or stretch of language to treat an unsuccessful lawsuit seeking an injunction against employment as an "attempt by words or writing, or any other means whatever" to prevent Lockhart, an "employee who may have voluntarily left said company's service," from "obtaining employment with any other person, or company."

■ The statute offers no safe harbors for unsuccessful lawsuits. As applied to such lawsuits, the statute provides a means for balancing the power of the former employer and the employee. Apart from the effect of the blacklisting statute, a former employer who sues to stop a departing employee from going to work for a competitor faces no serious adverse consequences from the lawsuit, apart from its own attorneys' fees. In addition, an employer may draft an unreasonably broad and burdensome noncompetition agreement and take advantage of the in terrorem effect. The departing employee at the very least is likely to need to hire a lawyer to obtain advice that the contract probably will not be enforceable. On the other side of the power equation, even the mere threat of a lawsuit can be enough to discourage the departing employee from going to work for a competitor. And if the employee is not discouraged, the prospective new employer may be. A new employer may be pleased by the prospect that a new employee will be joining up, but its ardor can be dampened considerably by the threat of sub-

stantial litigation costs. When the threat becomes reality, there is often a real possibility that the new employer may abandon the employee and look for someone else whose employment will not cause such costs and distractions. Treating unsuccessful lawsuits to enjoin employment as attempts by "any other means whatever" to prevent a former employee from obtaining employment with another person is therefore consistent with both the broad language and the general purpose of this Indiana statute enacted to protect departing employees. Lockhart has proven a violation of the statute.

■ The blacklisting statute provides for compensatory and "exemplary" damages. Plaintiff argues that Lockhart has failed to prove damages resulting from its efforts to prevent his employment by GAF because Lockhart in fact has been working for GAF and because GAF has agreed to pay Lockhart's legal fees in this action. The court finds that Lockhart is entitled to compensatory damages in the amount of his litigation costs, including attorneys' fees, that have accrued to date. The evidence shows those fees are at least $50,000, and the court will award compensatory damages in that amount. GAF's agreement to indemnify Lockhart does not defeat his damages claim any more than an insurer's agreement to indemnify its insured undermines the insured's claim against a wrongdoer. If GAF were to breach or default on its promise to Lockhart, Lockhart would still be indebted to his attorney and he would still be entitled to damages. Whether GAF has a valid claim against Lockhart for reimbursement out of any damage award should not affect plaintiff's liability on the counterclaim.

■ The court will not award "exemplary" or punitive damages under § 22–5–3–2. While exemplary damages may be warranted in cases that involve malicious efforts to destroy a former employee's career through extrajudicial means, the court believes that Indiana courts are unlikely to award exemplary damages where the statutory violation is simply the bringing of an unsuccessful lawsuit. On this point, it is useful to compare the tort of malicious prose-

cution. One essential element of that tort is the absence of probable cause for the instigation of legal proceedings against the plaintiff. See *Maynard v. 84 Lumber Co.,* 657 N.E.2d 406, 408 (Ind.App.1995); *Kroger Food Stores, Inc. v. Clark,* 598 N.E.2d 1084, 1087 (Ind.App.1992); *Aluminum Co. of America v. City of Lafayette,* 412 N.E.2d 312, 314 (Ind.App.1980). Punitive damages are available for malicious prosecution, see *Kroger Food Stores v. Clark,* 598 N.E.2d at 1091 (upholding award of $1 million in punitive damages), but the tort also requires, as its name suggests, proof of malice, and even then punitive damages are not awarded automatically. In this case the plaintiff had a reasonable basis in law and fact for filing and pursuing the lawsuit The court does not believe that Indiana courts would award exemplary damages under the blacklisting statute without evidence of malice and lack of probable cause, neither of which was proven in this case.

### Conclusion

Defendants Lockhart and GAF are entitled to judgment on all of plaintiff's claims. Defendant Lockhart is entitled to $50,000 in compensatory damages from plaintiff Bridgestone/Firestone, Inc. on his counterclaim under Ind.Code § 22–5–3–2, but is not entitled to relief on any of his other counterclaims.