**DEL MONTE FRESH PRODUCE COMPANY and Del Monte Fresh Produce, N.A., Inc., Plaintiffs,**

v.

**DOLE FOOD COMPANY, INC. and Dole Fresh Fruit Company, Defendants.**

**Del Monte Fresh Produce Company and Del Monte Fresh Produce, N.A., Inc., Plaintiffs,**

v.

**Dole Food Company, Inc. and Dole Fresh Fruit Company, and Daniel W. Funk, Defendants.**

**Nos. 00–1171–CIV, 00–4000–CIV.**

United States District Court, S.D. Florida.

May 24, 2001.

See, also, 136 F. Supp.2d 1271.

Carlos Mario Sires, Rima Youakim Mullins, Kirkpatrick & Lockhart, Miami, FL, Edward E. Vassallo, Fitzpatrick Cella Harper & Scinto, New York City, Stuart Harold Singer, Boies Schiller & Flexner, Hollywood, FL, for Plaintiffs.

Harley Shepard Tropin, Gail Ann McQuilkin, Kozyak Tropin & Throckmorton, Miami, FL, Robert C. Zundel, Jr., David L. Dawson, Bond Schoeneck & King, Naples, FL, James S. Teater, Jones Day Reavis & Pogue, Dallas, TX, Frederick L. McKnight, Wendy L. Thomas, John J. Murphy, Suzanne C. Jones, Jones Day Reavis & Pogue, Los Angeles, CA, Kathleen M. Vanderziel, Dole Food Company, Westlake Village, CA, Frederick D. Friedman, O'Neill Lysaght & Sun, Santa Monica, CA, Gerald J. Houlihan, Houlihan & Partners, Miami, FL, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

GOLD, District Judge.

**THIS CAUSE** is before the court upon Del Monte's motion for preliminary injunction (DE # 6 in Case No. 00–4000–CIV–SEITZ) to prevent the alleged misappropriation of trade secrets by Dr. Daniel W. Funk ("Dr.Funk") and his employer, Dole. On October 20, 2000, Del Monte filed a one-count complaint against Dr. Funk and Dole alleging violations of Florida's Uniform Trade Secrets Act, Fla.Stat. § 688.001 et seq. On October 31, 2000, Del Monte filed a motion for preliminary injunction. The court held a hearing on this motion on March 29, 2001. After carefully considering the parties' arguments, the evidence presented, and the relevant law, the court denies the plaintiffs' motion for preliminary injunction.

### Facts and Procedural History

#### I. Prior Proceedings In Related Case

On March 28, 2000, Del Monte filed a four-count complaint against Dole (Case No. 00–1171–CIV–GOLD) alleging as fol-

lows: count I, reverse palming off in violation of the Lanham Act, 15 U.S.C. § 1125 et seq.; count II, misappropriation of trade secrets under the Florida Trade Secrets Act, Fla.Stat. § 688.001 et seq.; count III, conversion; and count IV, deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.204 et seq. Dole filed a motion to dismiss Del Monte's complaint, and the court issued an order on that motion on February 22, 2001. In its order, the court granted without prejudice Dole's motion to dismiss counts I and II, and it denied the motion as to counts III and IV. Del Monte has filed an amended complaint within the appropriate time in order to address its pleading deficiencies.

While the motion to dismiss in Case No. 00–1171–CIV–GOLD was pending, Del Monte filed a complaint against Dole and Dr. Funk. This case was randomly assigned Case No. 00–4000–CIV–SEITZ. Because both of Del Monte's cases involved substantially the same allegations, they were consolidated under Case No. 00–1171–CIV–GOLD.

## II. Del Monte's Motion for Preliminary Injunction and the Proceedings Related to It

Del Monte seeks to enjoin Dole and Dr. Funk from misappropriating trade secrets that Dr. Funk allegedly acquired during his former employment with Del Monte. Del Monte's motion argues than an order pursuant to Florida's Uniform Trade Secrets Act, Fla.Stat. § 688.001 et seq., is appropriate to prevent Dr. Funk from working at Dole. Alternatively, Del Monte requests an order that prevents Dr. Funk from disclosing Del Monte's trade secrets and other privileged and confidential information and prohibits Dole from seeking such information, directly or indirectly, from Dr. Funk. Dole and Dr. Funk oppose the motion by arguing that no trade se-

crets exist. The defendants contend that, even if Dr. Funk did acquire trade secrets during his employment at Del Monte, Del Monte cannot otherwise satisfy the requirements to obtain injunctive relief.

During the hearing on Del Monte's motion, the court received evidence and heard the argument of counsel. The testimony of all witnesses was submitted through affidavits and depositions in advance of the hearing, with the exception of the cross-examination and redirect of Dr. Funk and Hani El–Naffy ("El–Naffy"), the president of Del Monte, which was presented live.

## III. Factual Background

### A. The Parties

Del Monte Fresh Produce Company, a Delaware corporation, and Del Monte Fresh Produce, N.A., Inc., a Florida corporation, (collectively referred to as "Del Monte") have their principal place of business in Florida. Dole Food Company, Inc., a Hawaii corporation, and Dole Fresh Fruit Company, a Nevada corporation, (collectively referred to as "Dole"), have their principal place of business in California. Del Monte and Dole sell pineapples, bananas, melons, and deciduous fruits in direct competition with each other. Del Monte is the largest marketer of fresh pineapples in the world, and Dole is the second largest. Del Monte is the third largest seller of bananas in the world, and Dole is the largest. (El–Naffy Affid., 2/21/01, ¶ 5).

Dr. Funk has worked in the agricultural industry for thirty years. He has a masters of science degree and a doctorate in plant pathology. (Funk Depo. at 26). Dr. Funk began his work in the industry in 1972 or 1973 with Chiquita Brands in Honduras and the Philippines, where he worked in many capacities, including plant pathologist, nemetologist, manager of production operations, and the head of banana opera-

tions. (Funk Depo. at 26). In 1980, Dr. Funk worked at Diamond Shamrock developing pesticides and projects for new agricultural crops. (Funk Depo. at 28–30). He began to work at Del Monte Corp. in 1984 as the director of research and development and quality assurance in California. (Tenanzas Depo. at 160). Dr. Funk joined plaintiff Del Monte (a different company from Del Monte Corp.) in Florida in 1986. (Funk Affid. at ¶ 2). Over time, he rose to the position of Senior Vice President for Research Development and Agricultural Services, which required high-level oversight and minimal involvement in research. (Funk Affid. at ¶ 2; Funk Depo. at 42–44). Dr. Funk became a resident and citizen of California in September or October of 2000, when he began working for Dole.

### B. Dr. Funk's Employment with Del Monte

Dr. Funk was employed by Del Monte from 1984 through September, 2000. Until he left Del Monte, Dr. Funk was Del Monte's senior scientist and one of its highest ranking executives. Dr. Funk was in charge of the company's research and development department, packing department, pesticide management, agricultural extension, environmental issues, quality assurance department, technical services department, and food safety program. Throughout the course of his employment, Dr. Funk had access to highly confidential information that involved all areas of the company's business over which he had responsibility. (El–Naffy Affid., ¶ 9; H. Sauter Affid., 2/16/01, ¶ 7). He also attended confidential senior management, marketing, and budget meetings. (El–Naffy Affid., ¶ 10, Ex. A).

As a high level executive at Del Monte, Dr. Funk occupied an auditing or overseeing function, not a production-level job. (Funk Supp. Affid. at ¶ 8; El–Naffy Depo. at 34). This means that his knowledge of formulas, processes, and techniques employed at Del Monte's local farming operations was minimal. (Funk Supp. Affid. at ¶ 8). Additionally, none of this work required him to formulate or apply specific processes, formulas, or techniques in Del Monte's local farming operations. (Funk Supp. Affid. at ¶ 10).

When Dr. Funk first began to work for Del Monte, he executed a confidentiality agreement with the company, which provides:

> It is understood that during the course of my employment I may acquire information and data of a confidential or secret character concerning the Company's operations and its research, experimental or development projects. It is agreed that during and after termination of my employment all such information and data shall be held by me in confidence and that same shall not be disclosed to others or publicized without the Company's written consent, or used by me for any purpose other than on behalf of the Company.

(Funk Depo., Ex. 13).

In 1996, 1997, and 2000, Dr. Funk received Del Monte's company-wide confidentiality policy, which advises employees that they cannot divulge confidential information during or after their employment with Del Monte. Dr. Funk acknowledged receipt of the policy, which provides, in pertinent part:

> [N]o Company Representative shall, either during his/her employment with the Company or thereafter, disclose to any third party or use any confidential information or trade secret of the Company ... without the prior written consent of the Company, unless and until such information becomes a matter of public knowledge through no fault of such Company Representative.

(Pl.'s Memo Supporting Prel. Inj. Mtn., Ex. 2). At no time during his employment with Del Monte did Dr. Funk enter into a noncompete agreement with Del Monte.

## C. The MD–2 Litigation

In April of 1996, Del Monte formally launched "Del Monte Gold Extra Sweet" pineapple, the brand name for a new pineapple variety known as the MD–2. The MD–2 variety is at the heart of the trade secret dispute that is the subject of the lead case of this litigation. Del Monte's primary allegation in that case is that Dole has misappropriated the trade secrets involved in the growth and development of MD–2.[1]

In 1999, Dole introduced a pineapple with the brand name of "Dole Premium Select" to compete with "Del Monte Gold Extra Sweet". In the same year, at the direction of Del Monte's general counsel, Dr. Funk located an expert to perform scientific testing on Del Monte's MD–2 and Dole's Premium Select. As a result of the testing, Del Monte's in-house counsel assembled a litigation team in January of 2000 to explore the possibility of a lawsuit against Dole for its alleged misappropriation of MD–2 and related secrets.

Dr. Funk was present during the first litigation meeting, which took place on January 17, 2000. Other participants were outside counsel, intellectual property specialists, in-house counsel, and key employees with knowledge relating to the MD–2. (Pinter Depo, p. 41). Dr. Funk's litigation duties were to determine a protocol for genetic comparisons between the MD–2 and Dole's Premium Select, determine a protocol for comparing and testing the two varieties in a manner other than genetic testing, and collect and assemble all previous confidential research that Del Monte had compiled over the years with respect

to MD–2. (Pinter Depo., p. 45–49). Dr. Funk participated in at least three more meetings with members of the litigation team. (Pinter Depo., p. 50).

## D. Dr. Funk's Dissatisfaction with Del Monte and Search for Employment With Dole

In December of 1996, Del Monte was purchased by its current owners, and El–Naffy assumed the presidency of the company. Dr. Funk became dissatisfied with the new management style and the new owners' decision to eliminate significant executive benefits. (Funk Supp. Affid. at ¶ 27; El–Naffy Depo. at 24, 49; McKenney Depo. at 21). On January 26, 1997, Dr. Funk wrote a memorandum to El–Naffy, which stated, in part:

> I am thinking of retiring now and joining an existing firm that offers consultation to agrochemical and agribusiness companies, including Del Monte if there is an interest. In that case, however, the knowledge and experience that I have gained at Del Monte will be available to the community at large. Del Monte may wish to retain proprietary rights to my potential contributions to the industry.
>
> If Del Monte wishes to retain some proprietary ownership over what I have learned and experienced, I would expect enhanced retirement compensation. A package including 3 years' salary plus $30,000 seems reasonable. With this enlargement, Del Monte might be given first option to contract my consulting services for one year for a negotiable period of time.

(El–Naffy Depo, Ex. 1:K).

At the same time Dr. Funk wrote this letter to El–Naffy, he also was exploring

---

1. The court has not yet determined whether the MD–2 variety and the accompanying growth and development techniques constitute trade secrets.

possible employment with Dole. On January 12, 1997, Dr. Funk wrote a letter to the president of Dole seeking employment. (Nielson Depo, Ex. 8). It is not clear from the record whether Dole offered Dr. Funk employment in Costa Rica in response to his inquiry.

In 1998, Dr. Funk learned that Dole's vice president for quality insurance, Tony Hepton, retired. Although Dr. Funk expressed his interest in this position to Dole, Dole did not consider him as a replacement for Hepton. (Nielson Depo., p. 115–17).

### E. Dr. Funk Obtains Employment From Dole

On April 6, 2000, Dr. Funk wrote a letter to the president of Dole, stating:

This letter is a continuation of conversations that we have had over the past three years or so. You are aware of my technical skills and that I presently lead a corporate activity with worldwide responsibility for R & D, QA, Agricultural Production audits, Pesticide Management, Environmental Protection, and Food Safety on all Del Monte crops.

I am writing to remind you that my background and experience may be of special utility to DOLE as you are contemplating organizational and strategic maneuvers. I would consider employment, a contractual consultancy, or any other appropriate arrangement.

The specific programs that I have participated in personally may be of significance to your Company.... Since joining Del Monte in 1984, I have headed technical programs for all crops, including commercial development of the MD–2 pineapple, fresh cut pineapples, and melons....

From my perspective, there will be no better opportunity to provide immediate beneficial service to DOLE than the present time.

(Nielson Depo., Ex. 9).

Dr. Funk sent a follow-up letter on July 21, 200, inquiring about the formalities that should be followed concerning a formal job posting. He also referenced "a few items concerning relocation to California that [he] would like to consider more thoroughly before giving Del Monte notice of [his] imminent retirement." (Nielson Depo., Ex. 10). In early August, Dr. Funk traveled to California, where he met with Dole's president, the head of Dole's human resources department, and Dole's vice-president and in-house counsel, who was overseeing the MD–2 litigation for Dole. (Nielson Depo., at 58–59). Throughout his negotiations for employment with Dole, Dr. Funk continued to work on sensitive matters at Del Monte, and he told no one at Del Monte about his efforts to obtain new employment.

On August 16, 2000, Dr. Funk tendered his resignation to Del Monte. He wrote a memorandum to El–Naffy, indicating that it was "economically unattractive" for him to continue his employment with Del Monte. (Funk Depo., Ex. 12). Within one week of this letter, El–Naffy met with Dr. Funk and offered him an additional $55,000 if he stayed with Del Monte, but Dr. Funk declined the offer. (Funk Depo. at 113–14). Although Dr. Funk informed El–Naffy that his last day of work was to be August 31, 2000, he agreed to extend his employment for an additional two weeks. (Funk Depo. at 121, 124). Dr. Funk's last day with Del Monte was Friday, September 15, 2000. Before Dr. Funk left the company, Del Monte's in-house counsel reminded Dr. Funk of his confidentiality obligations to Del Monte. (Pinter Depo. at 65).

On Monday, September 18, 2000, Dole sent Dr. Funk a letter confirming Dole's

offer and Dr. Funk's acceptance of the position of Vice President for Quality Assurance. (Nielson Depo., Ex. 1). Dr. Funk began his new position with Dole in California on October 2, 2000. (Funk Depo. at 25, 26). According to Dr. Funk, he is one of four Del Monte executives who have left the company to work for a Del Monte competitor. (Funk Supp. Affid. at ¶¶ 13–14).

### F. Dr. Funk's Responsibilities at Dole

Dr. Funk's responsibility as Vice President for Quality Assurance at Dole is an executive position with high-level oversight duties. (Funk Depo. at 161). Del Monte claims that Dr. Funk's job duties at Dole overlap significantly with the ones he had at Del Monte, while Dole contends that most of Dr. Funk's responsibilities are completely different from those at Del Monte. Dole's job posting indicates that some of Dr. Funk's duties actually are the same or similar. For example, the posting states that the Vice President of Quality Assurance will be at the "heart" of production facilities and will develop and ensure implementation of quality assurance standards. (Nielson Depo., Ex. 5). It also states that "fresh" is eighty-five percent of the business. (Nielson Depo., Ex. 5). During his deposition, Dr. Funk stated that his job at Dole encompasses food safety, which includes pesticides, disease control, and control of other organisms. (Funk Depo. at 166, 182).[2] He added, "[W]ith respect to quality assurance, I see my job as making sure just as I did at Del Monte that the operating units have these systems in place so we can protect the company and make sure food is safe and the product meets specifications." (Funk Depo. at 155, 168).

In other respects, Dr. Funk's position at Dole differs from the one he occupied at

Del Monte. His position includes responsibility for canning operations, an area in which he was not involved at Del Monte. (Funk Depo. at 161). Additionally, Dr. Funk has no involvement with the cultivation or breeding of pineapples at Dole. (Funk Affid. at ¶ 6).

### G. Dole's Precautions Against Disclosure

When Dr. Funk was hired by Dole, Patrick Nielson, Dole's Vice President of Legal and Regulatory Affairs, "made it very clear" to Dr. Funk that Dole did not want any information Dr. Funk may remember from his employment with Del Monte and that Dole would not accept any such information. (Funk Depo. at 158; Nielson Depo. at 77–80). Dole specifically instructed Dr. Funk that he should not bring any documents or files from Del Monte, and Dr. Funk agreed to follow that instruction. (Nielson Depo. at 78–79). Dole also instructed its employees who may come into contact with Dr. Funk that they "should be vigilant to adhering to sensitivity and awareness not to request Dr. Funk for any information that he might regard or that might be proprietary to Del Monte." (Nielson Depo. at 104–05).

Even if Dole had not informed Dr. Funk that it had no interest in obtaining proprietary information from Del Monte, it appears that Dr. Funk has minimal, if any, proprietary information that may be of use to Dole. According to Dr. Funk, he has not memorized any of the solutions to problems or confidential information he obtained at Del Monte. (Funk Affid. at ¶¶ 7, 8; Funk Supp. Affid. at ¶ 5). He claims to have virtually no recollection of the details of the research and development projects he supervised during his employment at Del Monte, particularly as they relate to

---

**2.** Dr. Funk later contradicts this statement and claims that he has no responsibility for

pesticide management. (Funk Supp. Affid. at ¶ 3).

the MD–2 pineapple. (Funk Supp. Affid. at ¶ 11, 15, 40, 41). Not even Ross McKenney, Del Monte's witness on trade secrets, could remember or articulate specific proprietary protocols relating to the farming industry. (McKenney Depo. at 58–59, 62, 65–70, 90, 94, 96). Additionally, Dole has assured that Dr. Funk will not work in pineapple cultivation or breeding for one year in order to avoid the possibility of inadvertent disclosure of information relating to the MD–2 pineapple. (Funk Supp. Affid. at ¶ 6, 15).

### Jurisdiction and Applicable Law

The court has diversity jurisdiction over Del Monte's misappropriation claims against Dole and Dr. Funk pursuant to 28 U.S.C. § 1332. The plaintiffs are Delaware and Florida corporations, Dr. Funk is domiciled in California, and the Dole defendants are Hawaii and Nevada corporations. Additionally, the amount in controversy exceeds $75,000.

In determining what law applies to a case, a federal district court sitting in diversity must apply the choice of law rules of the forum state. *See Trumpet Vine Inv., N.V. v. Union Cap. Ptns. I., Inc.,* 92 F.3d 1110, 1115 (11th Cir.1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)). Under Florida law, a court analyzing tort claims applies the "most significant relationship" test set forth in the Restatement (Second) of Con-

flict of Laws § 145. *See Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla.1980) (abandoning traditional *lex loci delicti* rule in favor of Restatement rule). Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles in § 6.[3]

(2) Contacts to be taken into consideration in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Del Monte argues that Florida law governs this action because Dr. Funk's employment relationship with Del Monte was centered in Florida, Dr. Funk's solicited employment from Dole in the state, and Florida is where Del Monte's corporate headquarters are located. On the other

---

**3.** The general choice of law principles under § 6 of the Restatement are:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interest of those

states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and,

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

hand, California's contacts with this case also are significant because Dole is headquartered in California, Dr. Funk lives and works in that state, and the conduct Del Monte seeks to enjoin allegedly is taking place there.

It is not necessary to determine whether California law or Florida law applies here because there is no true conflict between the two states' laws as those laws relate to the protection of trade secrets. Instead, this case involves a false conflict in that California and Florida trade secret law is the same on the relevant issues of this case. *See Tune v. Philip Morris Inc.*, 766 So.2d 350, 352 (Fla. 2d DCA 2000) (describing three different circumstances giving rise to a false conflict, including the situation where the laws of the states are the same). Both states have adopted the Uniform Trade Secrets Act provision at issue, which authorizes injunctions for actual or threatened misappropriations of trade secrets. *See* Fla.Stat. § 688.003; Cal.Civ.Code § 3426.2. Furthermore, as explained more fully below, both states have adopted similar interpretations of the uniform statutes. Accordingly, the choice of law issue is not dispositive in this case.

### *Analysis*

### I. Standard for a Preliminary Injunction

A party seeking a preliminary injunction must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4) granting the injunction would not be adverse to the public interest. *See Warren Publishing Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir.1997); *Teper v. Miller*, 82 F.3d 989, 992–93 n. 3 (11th Cir.1996); *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir. 1989). The standard is not rigidly applied by assigning a fixed quantitative value to each of the four factors. Rather, the court must use a flexible scale which balances each consideration and arrives at the most equitable result given the particular circumstances.

The issuance of a preliminary injunction is an extraordinary equitable remedy which should not be granted absent a clear showing that the moving party has met its burden of proof. *See Cafe 207 v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir. 1993). Preserving the court's ability to render a meaningful decision after a trial on the merits is the primary justification for granting a preliminary injunction. *See United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir.1986). Findings made on an application for preliminary injunction are not controlling at a later hearing on a permanent injunction. *See E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1527 n. 1 (11th Cir.1985). With these basic principles in mind, the court now turns to the merits of the preliminary injunction application in this case.

### II. Substantial Likelihood of Success on the Merits

■ The sole count of Del Monte's complaint against Dole and Dr. Funk is for violations of section 688.003 of Florida's Uniform Trade Secrets Act, which authorizes a court to enjoin the misappropriation of trade secrets. Del Monte seeks a preliminary injunction to prevent the misappropriation of its trade secrets that allegedly are threatened by Dole's hiring of Dr. Funk. The relevant provision of Florida's Uniform Trade Secret Act states:

(1) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate

commercial advantage that otherwise would be derived from the misappropriation.

Fla.Stat. § 688.003(1).[4] The trade secret statute does not prohibit a former employee with knowledge of trade secrets from going to work for a competitor. It prohibits only "misappropriation" of trade secrets, which means the acquisition, disclosure, and/or use of the information to the disadvantage of the owner of the trade secret. *See* Fla.Stat. § 688.002(2) (defining misappropriation); Cal.Civ.Code § 3426.1(b) (same).

The Uniform Trade Secrets Act explicitly provides for two types of misappropriations—actual and threatened. Some courts recently have derived a third type— inevitable disclosure/misappropriation. Del Monte seeks to enjoin Dole and Dr. Funk under the theories of inevitable and threatened misappropriation. For the reasons discussed below, the court finds that Del Monte cannot prevail under either of these theories. As a result, its motion for a temporary injunction is denied.

### A. Trade Secrets

The Uniform Trade Secret Act defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla.Stat. § 688.002(4); Cal.Civ.Code § 3426.1(d). Del Monte claims that Dr. Funk had access to numerous trade secrets during his employment at Del Monte, including information relating to the MD–2 litigation and the growing techniques for that pineapple variety, pesticide concentrations and application processes, and the acquisition of new lands for future agricultural programs. Dole contends that this information does not satisfy the definition of trade secrets because it was generally known throughout the trade, and Del Monte did not attempt to maintain its secrecy. For the purposes of this motion, the court assumes, without deciding, that the relevant information constitutes protectable trade secrets under the Uniform Trade Secrets Act.[5]

### B. Inevitable Disclosure

■ Courts that have adopted inevitable disclosure apply traditional trade secret misappropriation principles to situations where there has been no actual or threatened misappropriation. In an inevitable disclosure case, a court can issue an injunction to prevent an employee from working for the former employer's competitor if the employer can demonstrate a real and present danger of disclosure. *See Merck & Co., Inc. v. Lyon,* 941 F.Supp.

---

4. California's Uniform Trade Secrets Act is identical. *See* Cal.Civ.Code § 3426.2(a).

5. Whether the information at issue constitutes a trade secret is an issue that has not been fully briefed or developed by the parties at this stage. However, the court and the parties will have ample opportunity to address this issue thoroughly in the future because the information relating to the MD–2 pineapple variety is also the subject of Del Monte's trade

secret claim against Dole in the lead case in this litigation. For purposes of this order, the court also assumes, without deciding, that the information regarding the MD–2 litigation strategy is a protectable trade secret. During oral argument, Dole's counsel conceded that the definition of a trade secret does not preclude the application of the Uniform Trade Secrets Act to litigation strategies. *See* Trans. 3/29/01, at 135.

1443, 1457 (M.D.N.C.1996). The employer need not show proof of a noncompete agreement nor actual or threatened misappropriation.

■ The Seventh Circuit decision of *PepsiCo., Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995) is the principal case on inevitable disclosure. In *PepsiCo,* PepsiCo sought to enjoin its former employee, William Redmond, from disclosing confidential information to his new employer, the Quaker Oats Company. *Id.,* 54 F.3d at 1263. During his employment with Pepsi-Co, Raymond signed a confidentiality agreement, but not a noncompete agreement. *See id.* at 1264. Redmond acquired a number of trade secrets at PepsiCo, such as knowledge of the company's plans for specific markets. *See id.* at 1265. After being employed at PepsiCo for some time, Redmond began negotiating with Quaker for employment, but he kept these dealings secret from PepsiCo. *See id.* at 1264.

PepsiCo argued that Redmond would "inevitably disclose" the trade secrets acquired at PepsiCo to Quaker because his new position gave him substantial input on Quaker's marketing and other business practices. *See id.* at 1266. The court agreed with PepsiCo and applied Illinois' Uniform Trade Secret Act to enjoin Redmond from working at Quaker. It adopted the reasoning of the district court, which had found that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [Quaker's products] by relying on his knowledge of [PepsiCo] trade secrets." *Id.* at 1269. The court agreed with PepsiCo's argument that Redmond "cannot help but rely on" Pepsi-Co's trade secrets while he works for Quaker. *Id.* at 1270.

It appears that only two other courts have adopted *PepsiCo*'s reasoning where a noncompete agreement has been lacking. In *Merck & Co., Inc. v. Lyon,* 941 F.Supp.

1443 (M.D.N.C.1996), a North Carolina district court enjoined a former employee from working on a particular product marketed by the plaintiff's competitor. *Id.* at 1458. The court based its decision on the inevitable disclosure doctrine, but it cautioned that North Carolina could enjoin threatened misappropriation based on the inevitable disclosure theory only when the trade secret is clearly identified and of significant value. *Id.* at 1460. In *Double-Click, Inc. v. Henderson,* 1997 WL 731413, No. 116914/97 (N.Y.Sup. Nov. 7, 1997), a New York court granted an injunction under the inevitable disclosure doctrine, where two former employees' new job functions inevitably would lead them to rely on their former employer's trade secrets. It is significant, however, that the plaintiffs in *DoubleClick* were actually caught misappropriating and using trade secrets. In effect, the *DoubleClick* court based its holding on its finding of actual misappropriation. *Id.* at *5–6.

According to Del Monte's argument under the inevitable disclosure doctrine, Dr. Funk's work over the past sixteen years at Del Monte involved confidential proprietary projects and knowledge that cannot be partitioned off in Dr. Funk's mind, even if he does not intend to reveal those secrets. Del Monte Mtn. at 7. Like the plaintiff in *PepsiCo,* Del Monte argues that, because Dr. Funk cannot separate what he has learned in Del Monte from what he must apply at Dole, he inevitably will disclose Del Monte's trade secrets to Dole.

If this case were governed by Illinois, New York, or North Carolina law, then Del Monte probably would succeed on its inevitable disclosure theory. However, this case is governed either by Florida or California law, and these states have not adopted the doctrine nor cited *PepsiCo* with approval. Florida has not had an

opportunity to discuss inevitable disclosure, and California, like many states that have been asked to adopt the doctrine, specifically has rejected it. *See Bayer Corp. v. Roche Molecular Sys.*, 72 F.Supp.2d 1111, 1117 (N.D.Cal.1999) (holding that inevitable disclosure doctrine is insufficient for injunctive relief where there was no evidence of intent to disclose and in light of California's strong policy of employee mobility); *Computer Sci. Corp. v. Computer Assocs. Int'l, Inc.*, 1999 WL 675446, No. 98–1374, 98–1440 (C.D.Cal. Aug. 12, 1999) (stating that inevitable disclosure has been rejected by California); *see also H&R Block Eastern Tax Svcs., Inc. v. Enchura*, 122 F.Supp.2d 1067, 1076 (W.D.Mo.2000) (rejecting assumption that exposure to trade secrets creates inference of inevitable disclosure); *EarthWeb, Inc. v. Schlack*, 71 F.Supp.2d 299, 310 (S.D.N.Y. 1999) ("[I]n its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory. Absent evidence of actual misappropriation by an employee, the doctrine should be applied only in the rarest of cases."); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F.Supp.2d 667, 682 (S.D.Ind. 1998) (rejecting inevitable disclosure claim where misappropriation was not seriously threatened).

Because neither Florida nor California have adopted the inevitable disclosure doctrine, that theory cannot afford Del Monte relief. Absent evidence of actual or threatened misappropriation, a court should not allow a plaintiff to use inevitable disclosure as an after-the-fact non-compete agreement to enjoin an employee from working for the employer of his or her choice. As one court has stated:

> [I]t has never been thought actionable to take away another's employee, when the defendant wants to use him in his own business, however much the plaintiff may suffer. It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor. If an employer expects so much, he must secure it by contract.

*Harley & Lund Corp. v. Murray Rubber Co.*, 31 F.2d 932, 934 (2d Cir.1929) (L. Hand, J.); *see also Bridgestone/Firestone, Inc.*, 5 F.Supp.2d at 681 ("A claim of trade secret misappropriation should not act as an ex post facto covenant not to compete."); *International Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F.Supp. 98, 101 (D.Minn.1992) (same); *Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 61 (Fla. 5th DCA 1995) ("Competition for business by a competitor ... is to be expected from former employees who are not bound by a non-compete contract.") (citations omitted). In this case, Del Monte made a decision not to enter into a noncompete agreement with Dr. Funk. Absent such an agreement, the court will not enjoin Dr. Funk from seeking employment with another company simply because he possesses some trade secrets and his new employer is a competitor of the plaintiff's. As adopted and interpreted by Florida and California, the Uniform Trade Secrets Act requires an additional element threatened or actual misrepresentation—in order to award a plaintiff relief. As such, Del Monte may not utilize the doctrine of inevitable disclosure to enjoin Dr. Funk from working at Dole, and its motion for a preliminary injunction on those grounds is denied.

**C. Threatened Disclosure**

█ As an alternative argument, Del Monte contends that this court can enjoin Dr. Funk's and Dole's "threatened misappropriation" of trade secrets. Del Monte's argument under this doctrine actually is no different than its argument under the theory of inevitable disclosure. According to Del Monte, it has established a threatened misappropriation because the circumstances of Dr. Funk's employment make

disclosure inevitable. In support of this argument, Del Monte again cites to *Pepsi-Co, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir.1995), and its progeny.

Upon reviewing the decisions of other courts discussing the inevitable disclosure doctrine, it becomes clear that there is some confusion as to whether threatened disclosure and inevitable disclosure are two different theories of recovery or whether inevitable disclosure is a way of establishing threatened disclosure. If the latter view is true, then, for the reasons stated in subsection II, B of this order, Del Monte cannot establish threatened disclosure through the theory of inevitable disclosure. If the two doctrines are different theories of recovery, then threatened disclosure requires separate analysis under the Trade Secrets Act. The following analysis assumes that the theories are separate and distinct and that threatened disclosure requires proof beyond inevitability.

Florida's and California's Uniform Trade Secrets Acts allow courts to issue injunctions to prevent threatened misappropriations of trade secrets, but they do not prohibit a former employee who has knowledge of a trade secret from working for a competitor. Instead, they prevent a former employee from acquiring or using a trade secret through or for improper means. *See* Fla.Stat. § 688.003(1) (defining misappropriation); Cal.Civ.Code § 3426.2(a) (same). During the preliminary injunction hearing, Del Monte did not present any evidence that Dr. Funk took with him from Del Monte any documents or records containing Del Monte trade secrets. Nevertheless, Dr. Funk's knowledge of Del Monte's business includes some information that arguably qualifies as protected trade secrets. For example, Dr. Funk was privy to information relating to the MD–2 litigation, and he participated in the development of MD–2.

Misappropriation of trade secrets is an intentional tort. *See PMC, Inc. v. Kadisha*, 78 Cal.App.4th 1368, 93 Cal.Rptr.2d 663, 673 (2000) (citing Cal.Civ.Code § 3426.1; *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal.App.4th 34, 6 Cal.Rptr.2d 602 (1992)). As such, Del Monte must show more than mere possession of a trade secret by Dr. Funk, yet this is all that it has shown. As one court has stated:

> More than a risk of irreparable harm must be demonstrated ... [an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights ... [i]njunctions will not be used merely to allay the fears and apprehensions or to soothe the anxieties of the parties.... A trade secret will not be protected by the extraordinary remedy of an injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue.... [I]n the absence of a covenant not to compete or a finding of actual or an intent to disclose trade secrets, employees "may pursue their chosen field of endeavor in direct competition" with their prior employer.... Merely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction.

*International Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F.Supp. 98, 101 (D.Minn. 1992) (citations omitted); *see also H & R Block Eastern Tax Svcs., Inc. v. Enchura*, 122 F.Supp.2d 1067, 1075 (W.D.Mo.2000) (stating that inevitability is not enough to justify injunctive relief and that a finding of unwillingness to preserve confidentiality is required).

Del Monte has attempted to establish "a substantial threat of impending injury", and therefore the inevitability-plus requirement, by introducing into evidence Dr. Funk's letters to Dole. Del Monte relies heavily on Dr. Funk's statement to

Dole regarding his work on the MD–2 pineapple. *See* Nielson Depo., Ex. 9. Viewed in isolation, this statement could be construed as an attempt by Dr. Funk to entice Dole to hire him based upon his ability to reveal trade secrets or litigation strategy. When viewed in context of the entire letter to Dole and Dr. Funk's overall dissatisfaction with the management at Del Monte, however, it becomes apparent that the statement regarding MD–2 was simply an attempt by Dr. Funk to tout his experience in the industry.

A finding that Dr. Funk's employment by Dole threatens the disclosure or misappropriation of trade secrets is not warranted here. Dr. Funk took no documents or confidential information with him when he left Del Monte, and there is no evidence that he made an effort to take such information. Although he had thorough knowledge of the business, the court finds credible Dr. Funk's testimony that he cannot remember this information with precision. This is especially true in light of Del Monte's own witness, Ross McKenney, who also stated that he could not remember the company's trade secret, although he had knowledge of trade secrets.

Additionally, when Dole and Dr. Funk worked out Dr. Funk's employment arrangements, they were very aware of Dr. Funk's obligations to Del Monte, as expressed in Del Monte's confidentiality agreements. As a result, Dole informed Dr. Funk that he was not to reveal any

confidential information to Dole employees, and Dole instructed its employees not to solicit any information from Dr. Funk. Dole has kept Dr. Funk away from any work relating to pineapple agriculture, and many of his obligations at Dole differ from those he had at Del Monte. Most importantly, Del Monte, at this juncture, has presented no evidence that Dr. Funk has made any disclosure of confidential information to anyone at Dole, including any information relating to litigation strategy to which Dr. Funk was privy. The court has carefully reviewed the record for circumstantial evidence of disclosure of this information and has found none that is persuasive and upon which a ruling can be made that disclosure is threatened.[6] Del Monte also has introduced no evidence that Dr. Funk is unwilling to uphold the terms of his confidentiality agreement. All of these circumstances indicate that misappropriation is not threatened in this case. *See Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667, 683 (S.D.Ind. 1998) (finding that misappropriation was not threatened where employee took no trade secrets, new employer was aware of employee's obligations to former employer, and employee could not remember trade secrets with any precision). Because Del Monte has not been able to show threatened disclosure of trade secrets, including any information relating to litigation strategy, it has not established a substantial likelihood of success on the merits.[7] Accordingly, it is:

6. Dr. Funk has stated that he has no intention of disclosing to Dole any information that could be considered a trade secret. *See* Funk Affid. at ¶¶ 15 ("Dole has made certain that I am not working in pineapple agriculture to avoid any possibility of inadvertent disclosure."), 33 ("I have absolutely no intention of sharing [information about the MD–2] with anyone."), 34 ("I have absolutely no intention of sharing [information about local experiments] with anyone."), 43 ( [I]f I did know [trade secrets], "I have not and will not dis-

close them to Dole."). For purposes of this hearing, the court finds this statement to be credible based on the fact that, at this juncture, Del Monte has not introduced any circumstantial evidence to lead a the contrary conclusion.

7. Because Del Monte has not met the first requirement, it is not necessary to discuss the remaining elements required for a preliminary injunction.

**ORDERED AND ADJUDGED** that Del Monte's motion for a preliminary injunction (DE #6 in Case No. 00–4000–CIV–SEITZ) is DENIED.